No. 7039.

ANN L. SPEARS VS. W. L. JACKSON, ADMINISTRATOR.

One who purchases a claim which he knows to be in suit, and legally contested, is entitled to recover on it only what he paid for it, with legal interest from the date of its transfer to him.

APPEAL from the Fifth Judicial District Court, parish of East Feliciana. *Wedge*, special judge.

*D. C. Hardee* for intervenor and appellant.

*Kernan & Lyons* for defendant and appellee.

The opinion of the court was delivered by

MARR, J. Mrs. Ann L. Spears, administratrix of the succession of

Alexander Spears, commenced this proceeding *via executiva* on a note for $3000, bearing eight per cent interest from November 30, 1868, and the mortgage by which it was secured, given by John S. Scott for the price of a plantation purchased by him of Spears. At the time this suit commenced, August 28, 1872, Scott was dead, and W. L. Jackson was the administrator of his succession.

On the sixth of November, 1872, the attorney for Mrs. Spears acknowledged receipt from the attorney of James King of $1608 48, "which, including amounts heretofore paid by James King, is in full of above mortgage claim, and I hereby transfer the same to said King, and subrogate him to all mortgages and privileges upon the same, with the understanding that the same may be continued in my name, as to conducting the proceedings for the use and benefit of said King."

The property was advertised for sale by the sheriff under the writ of seizure and sale, on the twelfth of December, 1872. The counsel for King informs us in his printed brief that the proceeding *via executiva* was changed into an ordinary action by consent of parties, to allow Jackson, the administrator, to set up any offsets he might have, without resorting to an injunction for that purpose. At what time this was done we can not ascertain from the record. We find, however, that the seizure was released on December 2, 1872, and the writ returned; and this was the end of that proceeding.

On the fourth of December, 1872, Jackson tendered to the attorney of King $1608 48, with interest and costs of court, in full satisfaction of the mortgage debt, which he declined to receive.

On the eighth of October, 1873, King intervened in the suit, alleging that he was the owner of the claim; and praying for judgment against Jackson as administrator, with recognition of the mortgage and vendor's privilege. Service was accepted by Jackson's attorney; and on the tenth of October Jackson answered, alleging that the transfer by Mrs. Spears to King was made pending the suit, and that it was the sale of a litigious right; that he had tendered to King the amount paid by him, $1608 48, with interest and costs to the date of the tender; and that King was bound to take that sum and interest in full payment. He also alleged that the sum so tendered was the only amount due on the note sued on.

There was no other pleading on the part of Jackson, and none on the part of King, except the petition of intervention, and the plea of prescription filed on the tenth of October against any and all accounts set up by Jackson as administrator, no reference to which is made in the answer.

The special judge who tried the case rendered judgment in favor of King for $1608 48, with interest at five per cent from the sixth of November, 1872, with recognition of the mortgage on the property described,

'Scott's administrator to pay the costs up to the tenth of October, 1873, and King, the intervenor, to pay those accruing since that date; and King appealed.

In this court the intervenor insists that he is entitled to the full amount of the note, with eight per cent interest from the thirtieth of November, 1868, less $468 73 paid by Scott to Spears on account. Scott's administrator contends that he is bound only for the $1608 48, with interest from the date of the transfer, because that is the amount paid by King for the claim, when it had become a litigious right; and because Scott had made payments to Spears on account, which reduced the debt to that amount.

The term *litigious rights* is used in the Code in two senses:

First—With respect to public officers, such as judges, attorneys, sheriffs, and clerks, who are forbidden, under pain of nullity, to purchase *litigious rights* which fall under the jurisdiction of the tribunals in which they exercise their functions. R. C. C., art. 2447.

Second—With respect to all persons, whomsoever, against whom *litigious rights* may have been validly transferred. R. C. C. 2652.

Article 2447 does not define the *litigious rights* which it forbids public officers connected with the administration of justice to purchase; and the meaning of the term is to be sought in article 3556, which defines terms of law used in the Code, " and not therein particularly defined." No. 18 of this article says: "Litigious rights are those which can not be exercised without undergoing a lawsuit;" and the *litigious rights* referred to in article 2447 are all such rights as fall within this definition.

Article 2652 authorizes him against whom a litigious right has been transferred " to get himself released by paying to the transferee the real price of the transfer with the interest from its date." The next article furnishes the definition : " A right is said to be litigious whenever there exists a suit and contestation on the same." It is in this sense that the term is used in article 2652. See Pearson vs. Grice, 6 An. 237, 238.

It is proven in this case by the testimony of Jackson, and by that of Herndon, who was the book-keeper of Scott & Cage, of their successors, Scott & Jackson, and of their successor, John S. Scott, that Spears was indebted to Scott & Cage in the sum of $157 56 for supplies furnished up to December, 1868; that on the fourth of December, 1869, Scott paid Spears $1000 on account of the note, which was due thirtieth November, 1869; that at same date Spears was indebted to Scott & Cage, in the sum of $275 33 for advances and supplies; and that in 1870 and 1871, Scott & Jackson made advances in money and supplies, amounting to $729 25, of which Spears paid $260 52 on the thirteenth May, 1871, leaving balance on this account $468 73.

Herndon and Jackson both saw Scott pay the $1000. Jackson was in the office of Scott & Cage, and saw Scott hand the book-keeper, Herndon, a check; Herndon went out, and returned in a few minutes, and handed to Scott a sum of money, out of which Scott gave Spears $1000 on account of the mortgage note. He says the conversation between Scott, Spears, and himself was about the property purchased by Scott of Spears.

Herndon could not find the check nor any receipt for the $1000; but he found the check book, and got the stub with the memorandum on it which he had made. What appears to be a *fac-simile* of this stub is copied in the record; and it shows that the check was No. 276, date fourth December, 1869, to the order of J. S. Scott, for $1500, of which to A. Spears $1000, change $500; and that this latter sum was deposited again "as could get no small change."

He also testifies that in the spring of 1872 Spears was in New Orleans; that a statement of all the accounts of the several firms of which Scott had been a member, including the $1000, was furnished by him to Spears, and acknowledged by Spears to be correct; that Spears desired Scott to allow Herndon to go to Feliciana and indorse on the note Spears held for the price of the plantation all the credits to which Scott was entitled on these several accounts; "and it was then he acknowledged the correctness of all the accounts."

He adds that Spears died suddenly on the boat, on the trip home, immediately after this. We may well understand, therefore, why Mrs. Spears was ignorant of this business, and why the credits are not on the note in accordance with the final understanding and settlement between Scott and Spears in the spring of 1872.

Our attention is called to a bill of exceptions taken by intervenor to the verbal testimony to prove the payment of the $1000, on the ground that the check on which the money was drawn would be the best evidence. This objection is not well taken. The payment was not by check. The check was for a larger amount; and it was payable to the order of Scott. If it had been produced, it would simply have proven that Scott on that day withdrew from the Citizens' Bank $1500. The memorandum on the stub, contemporaneous history, made by the book-keeper, enabled him to tell what became of the money, which the check itself could not have done. It is only where the check is to the order of the person to whom the money is paid that it affords evidence of such payment.

The testimony offered by intervenor is exceedingly meager and unsatisfactory. Judge McVea, the only witness, was attorney for Mrs. Spears: and he is satisfied she knew nothing of any payments except as stated by King. There is proof that General Hays, now dead, then a member of the New Orleans bar, professing to represent King, as he no

doubt did, called on Jackson, after Scott's death, for a statement of Spears's account, which was furnished him. There is nothing to show the motive of King in asking for this statement, nor is it proven that he received it. It is evident, however, that he was not ignorant of the state of the accounts between Scott and Spears at the time he acquired the mortgage claim. A statement was made up of the amount due on the note, in which are credited as payments by King, on February 21, 1871, $1550, and on July 1, 1871, $150; and as a payment by Scott on March 21, 1872, $468 73; showing balance due November 5, 1872, $1608 48, the amount for which the mortgage claim was transferred to him.

Judge McVea knew nothing of payments by King except from a memorandum in King's possession. He examined the accounts, and was satisfied that no more was due on the note, and his client was willing to take the $1608 48 for that reason. He says that Mrs. Spears would have taken this from Jackson or anybody else; and he thinks the reason that neither Jackson nor King would purchase the note or pay it at first was that there was some question as to the priority of a judicial mortgage on the property in favor of King. He stated that the memorandum in the possession of King was signed by Spears; but he afterward corrected himself and said he might be in error as to that. This testimony was given in June, 1877, nearly five years after the transfer of the claim to King. Mrs. Spears accepted King's statement of the payments made by him.

It is remarkable that this memorandum was not produced, or otherwise accounted for, except that Judge McVea says it remained in the possession of King. Neither King nor Mrs. Spears, the author of his title, nor the attorney who represented him in the acquisition of the claim, and who has represented him in this entire litigation, was called to explain this business. If the accounts were properly stated and credits given as proven by Jackson and Herndon, the balance due on the note on the fifth of November, 1872, would not exceed $1608 48; it would probably be a few dollars less; and in a suit between Mrs. Spears and Scott's administrator she could not have recovered more than that amount on the evidence in the record.

We have no doubt that Jackson had manifested his intention to contest this claim and to set up payments and offsets before the date of the transfer to King. This is evident from the stipulation in the transfer that the suit might be continued in the name of Mrs. Spears for the use and benefit of King; from the release of the seizure and the return of the writ which terminated the proceeding *via executiva* shortly after the transfer was made; and from the preparation made by Jackson to prove payments and offsets by taking the testimony of Herndon, at New Orleans, before the filing of King's intervention; and from his prompt offer

to pay King the price which he paid for the claim, immediately after the release of the seizure. Indeed, the counsel for King informs us that the suit *via executiva* had been changed into an ordinary action by conseut of parties to enable Jackson to make his defenses without resorting to an injunction. In the language of the Civil Code, art. 2653, there existed a suit and contestation on this claim, to the knowledge of King, at the time he took the transfer.

The evidence shows that the real price of the transfer was $1608 48. As to the payments alleged to have been made by King, they are not proven. It was his duty to have proven them: and he could have proven them by his own testimony, if he actually made them. The facts that he did not appear as a witness, and that he did not call any witness to prove that he had made these payments, are not reconcilable with any other theory than that he did not make any such payments. Scott's administrator was entitled to get himself released by paying the real price of the transfer, as provided by article 2652 of the Code; and if he had made a real tender of the amount, with interest and costs up to the date of the tender, and had deposited the money, subject to the order of King, he would have been discharged from all liability. Not having done this, the intervenor is entitled to recover the price paid by him for the claim, with legal interest from the date of the transfer, and the costs up to the date of the filing of Jackson's answer setting up the plea of litigious right, as decided by the district court.

The judgment appealed from is, therefore, affirmed with costs.