**UNITED STATES v. 12,918.28 ACRES OF
LAND IN WEBSTER PARISH,
LA., et al.**

No. 498.

District Court, W. D. Louisiana,
Shreveport Division.

June 25, 1943.

714

R. D. Watkins, of Minden, La., for Mrs. Kate Jackson Crichton and others.

A. S. Drew, of Minden, La., and Dale, Richardson & Dale, of Vidalia, La., for M. D. Saucier.

PORTERIE, District Judge.

The War Department of the United States found that it was necessary to the war effort to condemn 12,918.28 acres of land situated in the parish of Webster, Louisiana, for the purpose of constructing an ordnance plant for the production of explosive powder. Accordingly, the above-captioned suit was filed for the purpose of condemning this acreage.

These condemnation proceedings were instituted on July 3, 1941. The petition, paragraph 1, states: "In accordance with and pursuant to the provisions contained in the Act of Congress approved August 18, 1890 (26 Stat. 316), as amended July 2, 1917 (40 Stat. 241) and April 11, 1918 (40 Stat. 518; 50 USC Sec. 171 [50 U.S.C.A. § 171]) the Act of Congress approved March 11, 1941 (Public No. 11–77th Congress [22 U.S.C.A. § 411 et seq.]), and the Act of Congress approved March 27, 1941 (Public No. 23—77th Congress [55 Stat. 53]), the Secretary of War has determined that it is necessary and advantageous to the interest of the United States of America that certain land and appurtenances hereinafter described be acquired by the United States of America for military purposes in connection with the erection and establishment of a shell loading plant to meet the needs of ordnance requirements."

Paragraph 2 of the petition states: "That pursuant to this finding the Secretary of War has selected the hereinafter described land and has designated that said land in fee simple title, subject to the exceptions hereinafter noted, is suitable and necessary for the purposes of the United States of America, and that said selection, designation and determination is now in full force and effect, and the said Secretary of War has determined that said land should be condemned by judicial proceedings pursuant to pertinent acts of Congress."

The Government, in paragraph 4 of its petition, states, in part, as follows: "* * * upon the filing of the petition for the condemnation of any land to be acquired for such purposes, immediate possession thereof may be taken to the extent of the interest to be acquired and the lands

may be occupied and used for military purposes, without the necessity of any deposit being made at the time of said filing."

In its petition, the Government did not describe the property that is being condemned in the separately owned tracts. The description is by meander of the perimeter of the entire tract.

In paragraph 8 appear the names, among many others, of "T. Crichton, Jr., Minden, La.," and "T. Crichton, Jr., Trustee, Minden, La.," as purported owners of some of the land being condemned. Though the names of Mrs. Kate Jackson Crichton, Mrs. Kate Crichton Gredler, and Powell Crichton do not appear in the list, they are included under "Trustee" above.

Paragraph 10 states that all additional owners are made parties to the suit: "That all of the owners and the claimants named in Paragraph 8 above are made parties defendant hereto and also any and all additional persons, firms or corporations who may have or claim to have any interest, title or right in and to the land herein sought to be condemned, and it is requested that a curator ad hoc be appointed by the Court to represent any and all such unknown owners or claimants."

The prayer of the Government's petition filed July 3, 1941, follows:

"Wherefore, the premises considered, and to the end that all and singular the interest and title to the extent described in and to the lands hereinabove described in this petition, and sought to be taken, may be acquired by the United States of America by condemnation, in accordance with the several statutes and Acts of Congress in such cases made and provided, your petitioner prays that the defendants herein mentioned be duly cited according to law to appear and make answer hereto, and that the necessary orders of notice to the owners or persons interested in said property be endorsed hereon and for such orders as may be necessary for the listing, drawing and summoning of a jury of freeholders to determine the amount of compensation to be paid for the expropriation of said property;

"*Petitioner further prays that a curator ad hoc be appointed to represent all absentees and unknown persons, firms or corporations who may have an interest in the aforesaid property;* (Emphasis added.)

"Petitioner further prays that the court issue such orders, judgments and decrees as may be necessary to give the United States of America the right to take immediate possession of the interest and title to the extent above described, and proceed with the public works thereon as have been authorized by Congress;

"Petitioner further prays that after due delays and formalities the hereinabove interest and title to the land hereinabove described, which is the subject matter of this suit, be adjudged to your petitioner, the United States of America, upon payment of the amount of just compensation according to the verdict of the jury and the judgment upon such verdict as may be rendered herein in accordance with law; * * *."

An order of the court followed dated July 3, 1941, appointing Coleman Lindsey, Attorney at Law, curator ad hoc to represent all absentees and unknown persons, firms or corporations owning, or claiming to own, any right, title, interest or estate in, or any lien, encumbrance, easement or charge against the property described in the petition.

By virtue of an order signed by the Court on July 3, 1941, the United States of America was given immediate possession of the land described in the original petition filed herein on July 3, 1941.

After filing the original petition on July 3, 1941, and obtaining the order of immediate possession referred to hereinabove, the Secretary of War deemed it advisable to invoke the provisions of the Act of Congress approved February 26, 1931, 46 Stat. 1421, 40 U.S.C.A. § 258a and accordingly, declaration of taking No. 10 was filed on April 9, 1942, and was recorded in Webster Parish, Louisiana, on April 11, 1942. This declaration included tracts Nos. A-12; A-38 and D-1, the tracts involved in this controversy between Crichton and Saucier. In the judgment of declaration of taking, under the heading "Names of Purported Owners" to tract No. A-12 and tract No. D-1 appear, in the order named, first the names of the four Crichtons, then "Heirs of T. B. Neal", "Clarence A. Chandler", followed then by the names of four other persons, and finally appears "M. D. Saucier, Baton Rouge, La." The appearance of the name of M. D. Saucier, Baton Rouge, La., as a purported owner can be predicated only on his deed of October 31, 1923, from Mrs. Ida F. Neal, widow of T. B. Neal, for his second deed (and there are only two) had not been executed at this time. Then, under the heading of "Names of purported owners" of tract No. A-38

are given the following names: "Heirs of T. B. Neal, unknown", "Heirs of the person, if any, to whom T. B. Neal was married on April 2, 1884", "Widow and heirs of T. Crichton, deceased", and the names of two other persons; but it is noted that the name of M. D. Saucier is absent.

The Government then filed, on June 19, 1942, a supplemental petition and among other things prayed for a jury of freeholders to determine the amount of compensation to be paid for the expropriation of said property, including tracts Nos. A-12, A-38 and D-1. The Government also prayed that "after due delays and formalities, the hereinabove interest and title to the land hereinabove described, which is the subject matter of this suit, be adjudged to your petitioner, the United States of America, upon payment of the amount of just compensation according to the verdict of the jury and the judgment upon such verdict as may be rendered herein in accordance with law;". This provision of the prayer applied to the three tracts here in controversy. The prayer also refers to the property to be taken as that "sought to be taken * * * by the United States of America by condemnation * * *."

In this petition, the declarations of taking are all itemized, with the tract of land under each fully described, and the same names appear under the respective tracts as are stated above to have appeared in the judgment in declaration of taking.

The order of the court signed June 19, 1942, pursuant to the supplemental petition, provided that a jury of freeholders be summoned to try the issues between the Government and the defendants.

The Crichtons and Saucier, and others, were again cited to appear and assert their claims. Saucier was served with the original petition of July 3, 1941 (though his name was not listed) when he was served with the declaration of taking and with the supplemental petition of June 19, 1942 (his name listed then).

On August 17, 1942, Thomas Crichton, Jr., Mrs. Kate Jackson Crichton, Mrs. Kate Crichton Gredler, and Powell Crichton filed a claim under the Government's original petition of July 3, 1941, and under the Government's supplemental petition on declaration of taking Nos. 1 to 10, inclusive, of June 19, 1942. This latter supplemental petition included Tracts A-12, A-38 and D-1, but the claim of the Crichtons was only as to Tracts A-2, B-37, A-5,

A-29, B-31 and D-28, as to which they were the sole claimants, and for which they requested payment. The last paragraph of the prayer was as follows: "Defendants further pray that their rights to other lands within the area condemned by plaintiff in this proceeding and not at issue at this time, be reserved until such time as the matter is finally heard."

Under the prayer of the government that a curator ad hoc be appointed to represent all absentees and unknown persons, firms or corporations who may have an interest, Coleman Lindsey, attorney at law, was appointed by the court as curator ad hoc, and he did file on August 17, 1942, a reply in the proceedings in the form of a general denial of all the allegations in the government's petitions, original and supplemental. He likewise appeared as curator ad hoc to represent the heirs of T. B. Neal; Mrs. Ida F. Neal, if living; if dead, her heirs; Mrs. Emma Neal Douglas, if living, and her heirs, if dead; and the heirs of T. B. Neal and his deceased wife, classified as of unknown address; as to these, he, also, made answer in general denial. The prayer by the curator ad hoc in each instance was: "That the demands of plaintiff be rejected at its costs; and for all other orders and decrees necessary, full, general and equitable relief."

It is from this latter source ("the heirs of T. B. Neal") that is derived, either by blood or through will, "such interest, right, title, and estate that estate of Clarence A. Chandler and/or the Wachovia Bank and Trust Company had"—as was described the supposed litigious right Saucier subsequently bought.

█ And next is the purchase by Saucier on August 24, 1942, of "such interest, right, title and estate that the estate of Clarence A. Chandler and/or the Wachovia Bank and Trust Company had." This date is important in the determination of whether or not Saucier bought a litigious right, for it is at the time of his purchase that the right is classified.

There was a trial by a jury of freeholders on September 28, 1942, to fix the value of the tracts of land Nos. A-12, A-38, and D-1. Previously to this date, on August 31, 1942, Saucier asserted his interest in the three tracts, and the Crichtons asserted their interest in the three tracts just before the opening of the trial before the jury of free-holders. The distribution of the amounts of money fixed by the jury

for these three tracts of land—being one phase of the original and only one expropriation suit—came for trial on November 23, 1942. The minutes of the court and the transcript of record show that the Crichtons before the opening of this phase of the trial filed a motion to dismiss because Saucier had no claim upon which relief could be granted, and also filed a motion to pay Saucier the price of a litigious purchase, with interest.

The government through the office of the district attorney, though there was awarded a judgment of declaration of taking since April 9th, 1942, had a further and final proceeding before the court, decree in which was filed on December 3, 1942, and the purpose of which proceeding was to declare: "Let the United States be ordered to deposit into the Registry of this Court the sum of * * *" and here, in nineteen instances, various additional sums were mentioned to be deposited in addition to the original sums deposited by the government at the time of taking; the additions being necessary because the jury of freeholders had in nineteen instances awarded more than the first estimated deposit of the government.

There is narrative language in this judgment which, as a matter of ultra precaution, is rehearsive of all the procedure of this one suit in expropriation for the Minden Shell Plant by the government, but this language need not be quoted, for it does not add to or detract from what the court has stated in the above paragraph as being the content of the judgment.

Our task now is to rule upon the motion to dismiss, and if our conclusion be to overrule the motion to dismiss, then to rule upon the motion that Saucier is to be paid by the Crichtons the amount he paid for what is alleged to be a litigious right.

Motion to Dismiss Filed by Crichtons because of Failure of Saucier to State a Claim upon which Relief can be Granted.

This motion and, also, the motion in connection with the purchase of a litigious right are not affected by the events in this expropriation suit subsequent to the date of the purchase, on August 24, 1942, by Saucier from the Wachovia Bank and Trust Company, as trustee for Mrs. Martha Ashcraft Chandler and Clarence Ashcraft Chandler, a minor. Both motions are pivoted on the factual and legal status of the expropriation suit as of that date.

The judgment on declaration of taking of the property involved by the United States, dated April 9, 1942, was under 46 Stat. 1421, c. 307, § 1, Feb. 26, 1931, 40 U.S.C.A. § 258a, and, also, under the statutes named in paragraph 1 of the first Government petition, filed on July 3, 1941. We quote a part of the 40 U.S.C.A. § 258a: "Upon the filing said declaration of taking and of the deposit in the court, to the use of the persons entitled thereto, of the amount of the estimated compensation stated in said declaration, title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation for the same shall vest in the persons entitled thereto."

Subsequent to this date of declaration of taking by the United States Government, April 9, 1942, we are of the view that no one was in legal possession to pass any title in fee or any derivative thereof; all former owners to that date of acquisition by the United States Government are relegated to the compensation left by the Government in the registry of the court, for the rest of the paragraph of Section 258a, immediately following the above-quoted part, reads as follows: "and said compensation shall be ascertained and awarded in said proceeding and established by judgment therein, and the said judgment shall include, as part of the just compensation awarded, interest at the rate of 6 per centum per annum on the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much thereof as shall have been paid into the court. No sum so paid into the court shall be charged with commissions or poundage."

We are not moved from this position by any of the language of Section 258b, 258c, or 258e, which might be thought to indicate a different conclusion. We believe the judgment in declaration of taking passes the title to the United States of America without there being a thing further to do. Any further judgment predicated upon the verdict of a jury of freeholders, fixing the value of the property,

taken, and, as is common, by default, declaring the property condemned for a public purpose, confirmatory of the decree in declaration of taking, does not add to or detract from the original title already passed, fully and definitely, and is not necessary to complete the title in the United States. City of Oakland v. United States, 9 Cir., 124 F.2d 959; United States v. Sunset Cemetery Co., 7 Cir., 132 F.2d 163; United States v. Eighty Acres of Land in Williamson County, Illinois, D.C., 26 F.Supp. 315, 320; United States v. 72 Acres of Land, etc., D.C., 37 F. Supp. 297; United States v. Certain Parcels of Land, D.C., 40 F.Supp. 436; United States v. 243.22 Acres of Land D.C., 41 F.Supp. 469; United States v. .8677 Acre of Land in Richland County, D.C., 42 F.Supp. 91; United States v. 2,049.85 Acres of Land, D.C., 45 F.Supp. 731; United States v. Certain Lands in Town of Highlands, D.C., 48 F.Supp. 306.

Under 40 U.S.C.A. §§ 258a, 258c, 258e, condemnation of land for public use is effected and title is completely vested in the government by the mere filing of declaration of taking, and judgment adjudging title in the government is unnecessary, and after vesting of title the government can be divested of title only by virtue of appropriate congressional authorization, and not by an amendment to the declaration of taking. United States v. Sunset Cemetery case, supra.

In United States v. 243.22 Acres of Land, D.C., 41 F.Supp. 469 at page 471, Judge Moscowitz says: "The Court has no power to determine whether or not it is essential that the Government take the land, nor can the Court determine whether such taking is necessary, desirable or expedient, nor can the Court determine the purpose to which the land is to be put, if it be for a public purpose such question cannot be determined by the Court. The Court can not substitute its judgment for that of the Secretary of War. Such questions as, whether the land is being taken for military purposes, the necessity for the taking and the expediency of the taking are matters to be determined by the Secretary of War and not by the Court. See Old Dominion Land Co. v. United States, 4 Cir., 296 F. 20, affirmed 269 U.S. 55, 46 S.Ct. 39, 70 L.Ed. 162; United States v. Threlkeld, 10 Cir., 72 F.2d 464, certiorari denied 293 U.S. 620, 55 S.Ct. 215, 79 L.Ed. 708; United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L. Ed. 1063; Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170; Barnidge v. United States, 8 Cir., 101 F.2d 295."

The only deed relied on by Saucier having a date prior to the judgment of declaration of taking is his deed from Mrs. Ida F. Neal, widow of T. B. Neal, dated October 31, 1923, Conveyance Records of Webster Parish, Louisiana, November 5, 1923, Vol. 61, page 261. This deed, primarily and mainly, conveyed real property not involved in this litigation, and after describing in minute detail and particulars the actual property conveyed ended with the following paragraph: "Also all my right, title and interest in any other lands situated in Webster Parish Louisiana whether here described or not. My interest in said lands having been inherited by me under the terms of the will of my late husband T. B. Neal, deceased."

This deed, under the Louisiana law and jurisprudence, by and through the above-quoted language, conveyed nothing, being void for want of description. Daigle v. Calcasieu Nat. Bank in Lake Charles, 200 La. 1006, 9 So.2d 394; Baldwin v. Arkansas-Louisiana Pipe Line Co., 185 La. 1061, 171 So. 442.

Counsel for Crichton contends that Saucier had therefore no claim to any property at the time of the filing of the judgment on declaration of taking, and consequently, Saucier has no standing in court to make claim to any amounts on deposit as compensation for any of the land, citing 18 Am.Juris. 864, § 231, and Taylor v. New Orleans Terminal Co., 126 La. 420, 52 So. 562, 139 Am.St.Rep. 537.

But Saucier has filed in his answer on the issue of the determination of the ownership of the money left in court by the United States Government, a deed dated August 24, 1942, recorded in Webster Parish, September 1, 1942, from the Wachovia Bank & Trust Company as Trustee for Mrs. Martha Ashcraft Chandler and Clarence Ashcraft Chandler, a minor, both acting under orders of court in probate proceedings, to M. D. Saucier, conveying "all rights, title and interest in and to the following described property, to-wit: * * *" (description). This conveyance is "without any warranty of title whatsoever, not even the return of the money hereinafter mentioned." The amount paid is $400. The probate court order authorizing the trustee

in the above sale, states "such interest, right, title and estate that the estate of Clarence A. Chandler and/or the Wachovia Bank & Trust Company had." The lay and legal significance of "all rights, title and interest in and to the following-described property" is such that we are compelled to believe, and therefore rule, that Saucier acquired by his deed, though in date subsequent to the declaration of taking by the government, the right to appear in the expropriation suit and make claim to the money left by the government as public compensation for the private land taken. We must say that there is no failure to state a claim upon which relief can be granted.

█ Counsel for Saucier argue very much against the point that the declaration of taking, signed by the court on April 9, 1942, conveyed fully and without reservation title to the United States Government, because of the language, previously quoted, in the supplemental petition filed by the government on June 19, 1942. Further and additionally, they stress the following language in what purportedly is a final judgment rendered and signed at Lake Charles on December 3, 1942:

"This cause coming on for hearing * * *, a jury of freeholders having been drawn and summoned and duly empaneled, as required by law, and the issues herein being submitted to the jury of freeholders, and they, having returned a verdict herein in favor of the plaintiff, United States of America and against the various defendants hereinafter mentioned, condemning and expropriating the property herein described and assessing the value thereof at the following sums: * * *."

These two incidental statements, though contained in dignified judicial documents, are the result of error and inadvertence of which the judge was guilty, and brought about by the equal guilt of the office of the district attorney in that old office forms for customary expropriation proceedings were used which were rather inappropriate to use under 46 Stat. 1421, c. 307, § 1, Feb. 25, 1931, 40 U.S.C.A. § 258a,—the Congressional mandate that title immediately passes fully and completely to the United States at the moment of the signing, based upon the specified requirements, of a declaration of taking. This was an entirely new and radical departure from the previous provisions of expropriation statutes. There was nothing that the court could sign in error or ignorance that could add to or subtract from the legal significance of the declaration of taking previously signed.

Or, it may be better said that the Government, through careful and prudent attorneys, was being doubly cautious to make sure of its title. The circuit court pronouncement in United States v. Sunset Cemetery Co., supra, had not been made at the time.

Accordingly, the motion to dismiss must be overruled and denied.

Motion to Pay to M. D. Saucier the Price of a Litigious Purchase.

What has just been said in our overruling the motion to dismiss because of the want of a stated action upon which relief can be granted is to form a part of this discussion, particularly the ruling wherein it is held that Saucier bought nothing by his deed of October 31, 1923, from Mrs. Ida F. Neal, because of want of description. This ruling, with its reasons, is restated here, for it will develop to be an important premise to reach the final conclusion in this motion.

█ We are not in disagreement with any of the Louisiana jurisprudence under Articles 2652, 2653 and 2654, the dominant and exclusively controlling articles in the consideration of this motion (and this court may not, legally, disagree); particularly is it our duty not to disagree with the opinion in Sanders v. Ditch et al., 110 La. 884, 34 So. 860, for this opinion on litigious rights is fully analytical of all previous cases, correctly compares them, and reaches a conclusion harmonious not only to all previous cases to that time on the subject, but in keeping with the then status of the French jurisprudence (Article 2653, Louisiana Civil Code, being, literally, Article 1700 of the Code Napoleon). The Sanders v. Ditch doctrine, to the effect that "It seems that a suit brought does not alone suffice; that it is not enough that there should be a petition; that a copy of it and a citation should be served on the defendant. It is necessary that there should be an answer. Perhaps any plea will suffice" (34 So. at 867) is the Louisiana doctrine to this day. "The authors and the jurisprudence are in accord, recognizing that, for the exercise of the 'retrait' the litigious right is singly and alone the one upon which there is a suit, with issue joined" (translation supplied) is the present French doctrine. 19 Baudry-Lacantinerie, Traité Théorique et Pratique de Droit

Civil (3 ed. 1908) 935, no. 915.[1] The latest affirmance of the French doctrine is found in 10 Planiol et Ripert, Traité Pratique de Droit Civil Français (1932) 360, no. 319, in the following language: "There first must be a suit, with issue joined, and that litigation must not be ended; the eventuality of a suit would be insufficient." (Translation supplied.)[2]

■ Justice Manning, in the case of McDougall v. Monlezun, 38 La.Ann. 223, a case probably of equal dignity and significance to the Sanders v. Ditch case because the latter is mainly predicated on the former, says, 38 La.Ann. at page 226: "There was no suit pending at the time of the purchase by the plaintiff of this land, and the fact that a suit might possibly be necessary to enforce his claim to it does not constitute it a litigious right, and therefore the exception of the defendants was improperly sustained."

This particular condition controlling the sale of litigious rights under French law is verified by all the French commentators.

We note the following language in the McDougall case, found in the analysis therein of previous cases: "This was succeeded by Billiot v. Robinson, 13 La.Ann. 529, where the Court went further than it had yet done and held, although there was not a formal contestatio litis at the time of sale, it appeared from the particular facts of that case that the right purchased was litigious. There was, however, no abrasion of the general rule established by the antecedent decisions, the Court resting its judgment on the special facts of that case."

Have we special facts, or special pleadings, in this case?

Let us name the necessary factors of a characterization of the sale of a litigious right, such as will warrant, under Article 2653, "He against whom a litigious right has been transferred, may [to] get himself released by paying to the transferee the real price of the transfer, together with the interest from its date." (Article 2652). There are four essential conditions:

(1) That a suit exists, is pending, with issue joined;

(2) That the suit concerns fundamentally a right; not a suit wherein both parties are in agreement upon the substance (fond) of the right and are merely contesting auxiliaries or derivatives from the right, such as rank of claims, right of accounting, etc., under the right;

(3) That the suit is still in existence at the moment that the sale of the litigious right occurs;

(4) That the sale of the litigious right is for a price.

Let us make a quick analysis as to the presence of these necessary factors in the instant case. We shall consider them in the reverse order, because the necessary factors are more clearly and undebatably fulfilled in that order.

■ As to the fourth condition, that the sale was for a stated price, the sum stipulated in the deed of purchase by Saucier was unqualifiedly the sum of $400. The exact maximum sum that Saucier may recover is ⅔ of $26,822.50, or $17,882.

Under this factor, the circumstance that the price paid is slight as compared to the amount that might be collected through the prosecution of the litigation, and the further circumstance that the sale is made without warranty, even to the return of the price paid, are to serve to classify the sale of the right of action or of the property as to whether it be the sale of a litigious right or not. The exact language in Saucier's purchase is "that the sum of Four Hundred ($400.00) Dollars cash, offered by M. D. Saucier, is a fair and reasonable price for all such interest, right, title and estate," etc., showing circumstantially, but quite definitely, the purchase of a gamble in litigation.

"In the language of the Civil Code, art. 2653, there existed a suit and contestation on this claim, to the knowledge of King, at the time he took the transfer," forms a part of the opinion in Spears v. Jackson, 30 La.Ann. 523, 524, at page 528. Besides the strong circumstances given in our consideration above of this fourth factor, the fact that Saucier was served with a copy of the original petition of July 3, 1941, and with a copy of the supplemental petition of June 19, 1942, wherein, in both, appeared the Crichtons, named as purported owners, before his purchase on August 24,

---

[1] "Les auteurs et la jurisprudence sont d'accord pour reconnaître que, pour l'exercice du retrait, le droit litigieux est uniquement celui sur lequel il y a un procès engagé."

[2] "Il faut d'abord qu'un procès soit engagé et non terminé; l'éventualité d'un procès serait insuffisante."

1942, puts it beyond cavil that he had knowledge of the expropriation suit and that there was "contestation on the same."

The third factor is satisfactorily met because there is no question but that a suit is in existence at the time that the Crichtons seek to exercise a release in their favor by paying to the transferee the real price of the transfer. Motion for such a release was filed in open court on the very day, immediately before the beginning of the phase of the suit involving the distribution of the money deposited.

█ As to the second condition, it is undeniably true that the suit in its last phase has for its practical issue the question as to whether Saucier or Crichton is to receive a definite sum of money from the amount that the government of the United States, at the beginning of the suit, placed on deposit with the registry of this court. The secondary or theoretical issue is which one of the two had the title to the land for which, in expropriation proceedings, the government has made this deposit of money in court. A fundamental right as to title and consequent ownership of land is clearly involved.

The first factor, that at the moment of the purchase, on August 24, 1942, by Saucier from Chandler and the Bank there was a suit in existence, with issue joined, is the most difficult to resolve, not in the determination of the legal principles which are appropriately applicable, but in the finding of the controlling facts and the legal inference to be made from these facts.

We revert now to that particular part of what we said in disposing of the motion to dismiss, to-wit: that title passed immediately from every single titleholder, whoever he might be and wherever located, known or not known, to the United States Government, on the date of taking, April 9, 1942. Under the statute an amount of money to pay for the lands expropriated, estimated in a non-partisan manner to be sufficient and fair by the agencies of the United States Government (See Declaration of Taking No. 10, signed by the Secretary of War), is deposited in the registry of the court, and as to its distribution suit is joined between any and all holders of title to this property, not only between each one and the United States Government on the point of the sufficiency of deposit in the registry of court for full payment, but there is issue joined between any and all titleholders named, or not named, in the proceeding through the curator ad hoc, residents or nonresidents, known or unknown, inter sese.

█ In the case of Atlantic Coast Line R. Co. v. United States, 5 Cir., 132 F.2d 959, 961, at page 962, Judge Sibley says: "A condemnation proceeding brought against owners of several tracts of land is one suit. The several answers may in the discretion of the court be given separate trials. Discretion in this case was exercised by impaneling one jury for all (touching the selection of which no point is made), and then giving to these appellants in effect a separate trial before that jury, followed by a separate verdict on their land, and a separate judgment. We find no such confusion or prejudice to have resulted as would show an abuse of discretion."

In the instant case, we had less possible confusion or prejudice, because three separately selected juries (not one jury) valued the three tracts of land. However, no point is made of this; the above citation is meaningful here, because it supports the court's reasoning in the opinion, in its concept of this expropriation suit—from the first petition to the very last act thereunder, including the numerous jury trials because of the many tracts of land taken, the many special hearings with the ensuing orders and judgments fixing payments, etc.—*to be one suit.* The very able and sincere counsel for Mr. Saucier see it differently; they see the trial of November 23, 1942, on the question of supposed conflicting title between Saucier and the Crichtons to be a dissociated and totally separate suit; and, from that premise, they press what we consider a technical and short-sighted application of Article 2652 of our Code—in violation of the raison d'être of the Louisiana law on the sale of litigious rights.

The Roman law, from which the French derived mainly, and from which we derive through the Napoleonic Code, inhibited drastically the sale of litigious rights. 3 Oeuvres de Pothier, (2 ed. 1861) n° 590, p. 233; 19 Traité Théorique et Pratique de Droit Civil, Baudry-Lacantinerie et Saignat, Ch. XIII, n° 914, p. 932; 6 Explication du Code Civil, Marcadé, Arts. 1699-1701, De la Vente de Droits Litigieux, p. 365; 11 Cours de Droit Civil Français, Beudant, (2 ed. 1938) n° 397.

Pothier, one of the most distinguished of the French commentators, previously to

the redaction of the Code Napoleon in 1804, expressed himself as follows: "We denominate *litigious credits* those which are, or which may be, contested, either in whole or in part, by him whom we pretend to be the debtor of them, whether the process is already commenced, or whether, not being yet commenced, there is ground to apprehend it." 1 Pothier, Treatise on Contracts (Cushing's Translation 1839) 353, n° 584.[3]

The reflection of this severe condemnation of the sale of a litigious right to the degree of affecting it with nullity, first expressed in the Roman law, and continued in the French law until the draft of the Code Napoleon in 1804, is found in Article 2447 of the present Louisiana Code, its corresponding literal article in the Code Napoleon being 1597. The prohibition there is against "public officers connected with courts of justice" and Article 3556 (18) is then applicable. Spears v. Jackson, 30 La.Ann. 523. This reference to Article 2447 by us is not of direct importance in the consideration of the motion before us, for the legal factors in the consideration of our motion under Articles 2651 and 2652 are not only totally dissimilar but entirely separate.

There is significance in the fact that neither in France nor in Louisiana has the condemnation of the sale of litigious rights been relinquished, though there has been some attenuation in France in the strictness of the original condemnation represented by Articles 2652 and 2653, but the study of the present jurisprudence of either place discloses no further softening, but rather a firm and decided stand. Smith v. Cook, 189 La. 632, 180 So. 469, on rehearing, pages 471–473 (where direct reference is made to French sources); Gulf Refining Co. of Louisiana v. Glassell, 185 La. 143, 168 So. 755; Lavigne v. Louisiana Ry. & Nav. Co., 9 La.App. 509, 121 So. 251; Langston v. Shaw et al., 147 La. 644, 85 So. 624; and all French commentators.[4]

In concord, Justice Monroe in Sanders v. Ditch, supra, held Article 2653, reading as follows: "A right is said to be litigious, whenever there exists a suit and contestation on the same"[5] to be exclusive and limitative, and at the same time ruled out of the Code No. 18 of Article 3556—whenever Article 2653 (ordinary persons) is being applied but to be retained when Article 2447 (public officers) is being applied—reading as follows: "Litigious rights are those which can not be exercised without undergoing a lawsuit", because the preamble to Article 3556 says: "Whenever the terms of law, employed in this Code, have not been *particularly* defined therein, they shall be understood as follows:" (emphasis supplied). He holds that Article 2653 within the body of the Code is a definition "particularly" of a litigious right—the right inference.

The French commentators are in accord with Chief Justice Monroe, except that they need have nothing to say about Article 3556 of the Louisiana Code because there is no Article 3556 in the Napoleonic Code. Borrowed from Pothier, Article 3556 is purely an addition by the Louisiana redactors of our Code to the Napoleonic Code. Justice Manning was well aware of this when he wrote, as has been previously quoted herein, the opinion in the case of McDougall v. Monlezun, supra.

We translate Beudant, one of the

---

[3] "On appelle créances litigieuses, celles qui sont contestées, ou peuvent l'être en total ou pour partie, par celui qu'on en prétend le débiteur, soit que le procès soit déjà commencé, soit qu'il ne le soit pas encore, mais, qu'il y ait lieu de l'appréhender." Oeuvres de Pothier, Vol. 3, Art. VII, de la Vente des Créances Litigieuses, p. 231.

[4] Droit Civil, Planiol et Ripert, Vol. 10, Section II, pp. 357–366; Droit Civil Français, Aubry et Rau, Tome 5, pp. 247–255; Traité de Droit Civil, Baudry-Lacantinerie et Saignat, Ch. XIII, "De la Cession de Droits Litigieux," pp. 934–936; Cours de Droit Civil Français, Beudant, Vol. 11, "La Vente D'un Droit Litigieux," pp. 325–337; Commentaires du Droit Civil, Huc, Vol. 10, pp. 318–329; Nouveau Code Civil, Dalloz, Vol.

[4] "Vente" Art. 1699, pp. 286–294; Répertoire du Droit Français, Carpentier et du Saint, Vol. 9, Ch. II, "Du Retrait de Droits Litigieux," pp. 797–807; Examen du Code Napoléon, Mourlon, Vol. 3, pp. 257–261; Le Droit Civil Français, Zachariae, Tome 4, §§ 693, "De la cession de droits litigieux," pp. 340–343; Vente et Échange, Guillouard, Vol. 2, Ch. IV, "De la Cession et du Retrait de Droits Litigieux, pp. 414–426; Principes de Droit Civil, Laurent, Vol. 24, pp. 573–587; Explication du Code Civil, Marcadé, Vol. 6, pp. 365–373; Droit Civil, Troplong, De la Vente, Vol. 2, pp. 480–499.

[5] "La chose est censée litigieuse dès qu'il y a procès et contestation sur le fond du droit."

recent French writers, (1938), on the origin and justification of the principle contained in Articles 2652–2654, showing the debatable and the controversial character of the principle, fundamentally so because the sale of a litigious right is malum prohibitum and not malum in se (Sanders v. Ditch, supra, 34 So. at page 866):

"This right of release is manifestly in derogation of common right, which holds that no one, without his consent, may ever be deprived of a right once acquired. If he against whom a litigious right has been transferred exercises his right of release, the transferee is expropriated of the right he acquired.

"What is the origin of this derogation and how may it be justified?

"Its most apparent raison d'être is that it is attached to an ancient tradition.

"Roman law forbade the sale of litigious rights; it declared the sale null. It considered as litigious all rights which were the object of a pending suit, all the rights quae in lite deducta sunt.

"Less rigorous, the old French law admitted the validity of the sale of litigious rights. This innovation, however, was attenuated by the French law in granting the privilege of release to the one against whom the right had been bought. The motive which had forbidden the sale under Roman law explains the origin of the right of release under the French law which permitted the sale.

"Experience has shown, it is said, that the trade in litigious rights is suspected and gives rise to many disappointments. The buyer of litigious rights—and this is particularly true of the speculators who make it a business—exerts pressure on the seller, so as to buy it at a very cheap price; a high price is never paid for a right which is of questionable worth and which may have no value; after which, the buyer pursues without mercy the one against whom he bought the right, so as to obtain the most possible. Often, too, the buyer of a litigious right is one who, through passion, looks to buy a right against one whom he dislikes, with the design of molesting this person with unseasonable, and obstreperous prosecutions —even scandalous prosecutions.

"The right to the exercise of the release is the remedy for such dangers. The release is an expropriation in the interest of peace, a relief open to the one against whom the right is bought because of the disfavor which attaches to purchasers of lawsuits. If the one against whom the litigious right is bought avails himself of the release by the purchase of the pretended action against him, he puts an end to the court contest. It is all for good, the exercise of the release in suppressing the suit satisfies the social interest. Therefore the release is useful because of its results; and it justifies itself, moreover, by the cure it gives to many abuses. Consequently, we say, it is legitimate.

"Are these considerations really conclusive? It is subject to doubt. It is possible that the business of buying lawsuits is a suspected business; but is it a reason to allow the one against whom the right is held, to his private gain, to expropriate the buyer? This right is an attack on individual right which is little justified. The purchaser of a litigious right enters into an aleatory contract, which may lead him to loss as well as to gain; he speculates, and speculation is not a crime. The only reason which might be invoked to justify the release is that it puts an end to a lawsuit; this is of great good, but the respect of a right is still a superior good." Vol. 11, Cours de Droit Civil Français, p. 326, par. 397.[6]

---

[6] "Cette faculté de retrait est une dérogation manifeste au droit commun, d'après lequel une personne ne peut jamais être dépouillée malgré elle d'un droit lui appartenant. Si le cédé use de son droit de retrait, le cessionnaire est exproprié du droit qu'il a acquis.

D'où vient cette dérogation et comment se justifie-t-elle?

Sa raison d'être la plus apparente est qu'elle se rattache à une tradition ancienne.

Le droit romain interdisait la cession des droits litigieux; il la déclarait nulle. Et il considérait comme litigieux tous les droits faisant l'objet d'un procès pendant, tous ceux quae in lite deducta sunt.

Moins rigoureux, l'ancien droit français en admit la validité. Mais il atténua l'innovation en conférant au cédé la faculté de retrait (introduite a l'époque impériale au profit de tous les débiteurs cédés). Le motif qui avait fait interdire la cession en droit romain est celui qui explique le retrait.

L'expérience a montré, dit-on, que le trafic des droits litigieux est suspect et présente des inconvénients. Celui qui achète un droit litigieux—et il en est ainsi plus particulièrement des spécula-

724

■ The immediate objection to our declaration that there is issue joined, as above/described, in the instant case, is that under our ruling any and all persons having any right or claim to the money on deposit in the registry of court would be denied, upon and after the moment of deposit, of what is one of the most common, and we might say, inalienable, rights, that of selling or buying. This is error; sales may be had as usual, but each sale made to a third party will be subject to the exercise by a title-holder of the right of release under the Code articles on the subject of the sale of a litigious right, if the four factors characterizing a litigious right be present. The four factors must be concurrent, and their existence as a matter of fact in each case is to be determined by the courts.

It is definitely not detrimental to public policy for the practice under our law to be that in expropriation suits the right of release exists in every case, wherein the pleading status and the time of purchase are similar to the instant case. There would be general fairness, fully established, in the case of expropriations of land by the Government.

Any person nursing the hope that he is the holder of valid title and consequently there is money to be received by him from the amount on deposit would place whatever estimate he wishes on the worth of his claim, sell at whatever price he desires. If the sale be to a third party claiming no title, any conflicting title-holder could, in his own discretion, decide whether he would pay the amount paid by the buyer of the supposed litigious right in order to have peace, or would prefer not to do so and actually have the suit continue to trial, which, as we have already stated, has been automatically fully joined as to any and all parties by operation of law.

■ Counsel for Mr. Saucier have sought to say that there is no *issue* until both the Crichtons and Saucier have made claim to the identical portion of the fund deposited in court for reimbursement of the former land-owner; and that *issue is joined* only upon "answer" being filed by each of these contestants; and their argument is that since, at the time of the filing by the Crichtons of this plea of the purchase of a litigious right by Saucier, the Crichtons had not yet "answered," there was no issue joined and no "answer" filed, so as to enable the Crichtons to exercise the right of release.

This reasoning is fallacious. It no doubt comes from an attempt to fit definitions evolved from legal situations having a much narrower foundation to the more complex, but broader, concept of expropriation covering a large acreage.

It is plain that the "issue" is the land, and title to the land. And since title passes immediately upon the signing of the judgment of taking and the deposit of money in the registry of court, issue is joined at that moment. When the Secretary of War has certified the necessity of the taking, there can be no contest as to such necessity, and

teurs qui font métier d'en acquérir—exerce une pression sur le cédant, afin d'acheter à vil prix: on ne paie jamais bien cher un droit qui est discuté et peut n'avoir aucune valeur; après quoi, il poursuit le cédé sans merci, afin d'en obtenir le plus possible. Souvent aussi, l'acquéreur d'un droit litigieux est une personne qui, par passion, cherche à se procurer un droit contre un tiers qui lui est antipathique, dans le dessein de molester ce tiers par des poursuites intempestives, bruyantes, voire même scandaleuses.

Le droit de retrait est un remède contre ces dangers. Le retrait est une expropriation dans l'intérêt de la paix, une faculté ouverte au cédé à raison de la défaveur qui s'attache aux acheteurs de procès. Si le cédé exerce le retrait en acquérant la prétention qu'on faisait valoir contre lui, il met fin à la contestation judiciaire. C'est tout bénéfice; le retrait du droit litigieux, en éteignant le procès, donne satisfaction à un intérêt social. Donc il est utile par ses effets; et il se justifie, d'ailleurs, par les abus auxquels il remédie. En conséquence, dit-on, il est légitime.

Ces considérations sont-elles vraiment concluantes? Il est permis d'en douter. Il est possible que le métier d'acheteur de procès soit un métier suspect; mais est-ce une raison pour permettre au cédé, dans son intérêt privé, d'exproprier l'acquéreur? Cette faculté constitue une atteinte peu justifiée au droit individuel. Celui qui achète un droit litigieux fait une convention aléatoire, qui peut le conduire à perdre aussi bien qu'à gagner; il spécule, et spéculer n'est pas un crime. Le seul motif qu'on puisse invoquer pour justifier le retrait est qu'il met fin à un procès; cela est un grand bien, mais le respect du droit est encore un bien supérieur."

therefore any "answer," improperly so-called, is not possible. The only "answer" which can be made is a document setting forth a claim to a portion of the funds through former title, and it is not necessary that there should be a contest between two persons as to a portion of these funds, with "answer" filed by each, before issue is said to be joined; for let us suppose, as is often the case, that only one person makes claim to the fund. This sole claimant has still to make full proof of his legal and valid title. The issue is joined with the government. Surely it cannot be said that there was no "issue joined," when, as a matter of reality, title to land passed from the former owner to the Government, and the former owner claims, as reimbursement for his land, a certain sum of money in the registry of court. This must surely be denominated a "suit and contestation on the same," or it must be considered as an absolute absence of all action. The fact that title to land has passed, and the person is entitled to reimbursement, makes the latter theory patently and logically impossible.

▉ Moreover and additionally, we believe that a more technical use of the facts of this case, and with even stricter application under Article 2653 ("there exists a suit and contestation on the same") will lead us to the same conclusion. For, at the very moment of the judgment of declaration of taking by the government, there is a suit born; not only is the suit born but contestation on the suit exists. Contestation exists and the parties are joined (a) upon the citation through a curator ad hoc on all interested parties, known or unknown, and thus the Chandlers and the Wachovia Bank, as trustee, are included; and (b) upon the citation on the Crichtons, as occurred, and thus the four Crichtons are included. The very language of Article 359 of the Code of Practice of Louisiana describes well and accurately this happening: "The joining of issue is in fact the foundation of the suit, as citation is that of the action; it is only after this is done that the suit begins; the parties are then in a situation to discover what evidence is necessary in support of their respective claims."

A further examination by us of the original summons issued by the court, with the corresponding return of service of process endorsed by the marshal, shows that in conformity with the order of court following the first petition by the United States of America filed July 3, 1941, service of summons to comply with the demand contained in the petition was made, on July 28, 1941, on "all absentees and unknown persons, firms or corporations, owning or claiming to own any right, title, interest or estate in, or any lien, encumbrance, easement or charge against the property described in the petition attached, through Coleman Lindsey, Attorney at Law, Minden, Louisiana, curator ad hoc."

Article 116 of the Code of Practice of Louisiana, as amended by Act No. 167 of 1924, is regularly and validly used in the Louisiana practice. It provides, in part, "* * * the plaintiff must demand that an attorney at law be appointed to defend the suit. * * * if the person intended to be sued be absent and not represented in the State, or, in * * * expropriation suits * * * in which an absentee may be represented by an attorney at law appointed to defend the suit, if it be made to appear by affidavit that the residence of the defendant is out of the State or unknown to plaintiff, the attorney at law so appointed may waive service and citation of the petition, but shall not waive time or any legal defense."

A further examination by us of the original summons issued by the court, with the corresponding return of service of process, shows service on T. Crichton, Jr., individually, and on T. Crichton, Jr., Trustee, both on August 7, 1942; then, apparently to make certain of process on Mrs. Kate Jackson Crichton, on Mrs. Kate Crichton Gredler, and on Powell Crichton, additional services were made with such description noted, separately for each, by name, of both the original and supplemental petitions.

*All these services, without exception, were made before the purchase by Saucier of the supposed litigious right on August 24, 1942.*

Conclusively, the result under the law is that a suit on the ownership of the land exists and that there is "contestation on the same," at the time of Saucier's purchase.

No one, even if he be the only claimant to a certain tract of land taken, may collect except upon full proof in open court; the suit is filed, issue is joined, contestation exists, and what the claimant and the government do then is to have the actual evidence set out in open court. Louisiana Code of Practice, Article 359, supra.

The purchase by any dissociated third party of the right of claimant, after the declaration of taking and service of process, is not only the purchase of a litigious right but the purchase is at the time fixed by Article 2653 so as to permit of a release to be exercised by any other claimant who at the time of the sale of the litigious right was served with process.

The judicial admission that "other lands within the area condemned by plaintiff in this proceeding and not at issue at this time be reserved until such time as the matter is finally heard" by the Crichtons in a pleading when the title to other real property was involved is (a) obiter as to the property now involved, and (b) does not estop them from urging the present motion. Moreover, it is (c) adjective language which does not change the substance, nor the character and import, of the actual facts nor (d) may the individual characterization by the Crichtons privately of the status of the pleading transcend the true and legal characterization of the status of the pleading fixed, as a policy for the public good, by the Code article and the jurisprudence thereunder.

Underlying all these conclusions there must be borne in mind the provisions of Article 2654 to the effect that a sale between conflicting title-holders, or between co-owners, is an exception to the rule of Article 2653. Such a sale prevails and remains binding between the parties, and no release is permitted, for the obvious reason that a suit has been avoided. The purchase by Saucier from Mrs. Ida F. Neal, widow of T. B. Neal, October 31, 1923, specifically described no property involved in this suit, and under the cases of Daigle v. Calcasieu National Bank, and Baldwin v. Arkansas-Louisiana Pipe Line, supra, the Supreme Court of Louisiana has held that such an absolute want of specific description makes of the pretended sale a nullity. The contention of Saucier that he would be the co-owner of Chandler and the Bank because of this purchase by him in 1923, and that he could thus avail himself of the exception under Article 2654, is clearly not good.

In general review of what we have said, considering the factual background of this case, we conclude that not only, as is obvious, was there the purchase of a litigious right, in principle, under Article 2652, but it was purchased at a time as to clearly fall within the conditional requirements of Article 2653.

The motion by the Crichtons to pay to M. D. Saucier the price of a litigious right is granted and sustained; proper judgment will be signed upon presentation.