**UNITED STATES v. 12,918.28 ACRES OF LAND IN WEBSTER PARISH, LA., et al.**

**No. 498.**

District Court, W. D. Louisiana, Shreveport Division.

July 9, 1945.

R. D. Watkins, of Minden, La., for Mrs. Kate Jackson Crichton, T. Crichton, Jr., Mrs. Kate Crichton Gredler, and Powell Crichton.

A. S. Drew, of Minden, La., E. Leland Richardson, of Dale, Richardson, & Dale, all of Baton Rouge, La., for M. D. Saucier.

PORTERIE, District Judge.

In the above condemnation proceedings we have now to consider the issue on the merits between the Government and Mrs. Kate Jackson Crichton, Thomas Crichton, Jr., Mrs. Kate Crichton Gredler, and Powell Crichton, on the one hand, and between the Government and Moore D. Saucier on the other. United States v. Certain Parcels of Land, D.C.Md., 40 F.Supp. 436. Much of the narrative and many of the facts explanatory of the issue are omitted here, and the reader is referred to this same case when considered by us on a motion to dismiss and a motion to pay claimant the price of a litigious right, at, D.C., 50 F. Supp. 712, and when considered by the Circuit Court of Appeals (reversing us), at 147 F.2d 430.

It is admitted by the parties concerned that a full and complete title to the property involved was vested in William Bogel by virtue of a deed to him from H. M. Hyams, dated April 25, 1879, recorded in Deed Book 3, page 90, Webster Parish, Louisiana.

It is also admitted by all parties that a full and complete title to property involved was invested in Thomas B. Neal by virtue of the deed to him from William Bogel, dated April 2, 1884, recorded in Deed Book 4, page 209, of the same parish and state.

Then it is admitted by all parties that T. B. Neal, on July 23, 1887, sold an undivided one-third interest in the property

to A. Goodwill, Conveyance Records, Volume 5, page 198.

Then on October 17, 1900, T. B. Neal executed a deed to Thomas Crichton, the husband of the first-named and the father of the three latter-named Crichtons, the interpretation of which is one of our main duties. It is quoted in full as recorded,[1] and immediately thereafter is quoted in full[2] the original retained by Mr. Crich-

[1] "State of Georgia
"Fulton County

"Know all men by these Presents that I Thomas B Neal, a resident of the City of Atlanta state of Georgia, bargain sell transfer and deliver to Thomas Crichton, a resident of the Parish of Webster state of Louisiana. my one third and undivided interest in the following described land. situated in Webster Parish, Louisiana, to-wit: The East ½ of SW ¼ and SE ¼ of NW ¼ and Lot 17, Sec 7. Containing 520.$^{71}/_{100}$ acres. Lots 11 & 12. and NW fractional ¼. West ½ of NE ¼, South ½ of SE ¼ and SE ¼ of SW ¼ Sec 8. containing 424 $^{64}/_{100}$ acres South ½ of SE ¼ and NE ¼ of SE ¼. NE ¼ of NE ¼ and SE ¼ of NE ¼ sec 6. Containing 153.$^{98}/_{100}$ acres, Lot 13. South ½ and NW¼ of SW ¼. the West ½ of SE ¼ and SW ¼ of NE ¼ Sec 5 Containing 234.$^{30}/_{100}$ acres, the East fractional ½ and lots 5 & 8 sec 19 Containing 277.$^{78}/_{100}$ acres all except Lots 5 & 12 sec 18. containing 527.$^{71}/_{100}$ acres. North ½ Sec. 17 Containing 313.$^{72}/_{100}$ acres. The North ½ of the North ½ sec 24. T. 18. N. Range 10 West and Lots 3.4. and 2. in sec 19 T 18 N. Range 9 West Containing 296.$^{90}/_{100}$ acres except Right of Way of V S & P R R. 40 acres off. making a total of 2709.$^{74}/_{100}$ acres more or less. The Consideration of this sale is the sum and price of One thousand and sixteen dollars and fifteen Cents ($1,016.15) Cash in hand. the receipt of which is hereby acknowledged. this being at the rate of One dollar and twelve and one half cents $1.12½ per acre for my one third interest in the above described property. This done and signed in the City of Atlanta this 17th day of October 1900 in the presence of the subscribing witnesses—

"Witnesses   J. M. Dugger     T B Neal
   "W. F. Manry.

"Fulton County ⎰ In person came J M
"Georgia          ⎱ Dugger one of the subscribing witnesses to within who being duly sworn says he was Present and saw T B Neal sign within Deed and that he signed same as a witness in the presence of T B Neal and the other subscribing witness (seal)

    "W F Manry N. P. F. Co Ga.

"(Endorsed) Filed for record Oct 22/ 1900 J H Tillman Clerk D C. & Ex Off Recorder

"A true record made this October 27/ 1900

    "J A Colbert Dy Clk D C & Ex Off
                         Recorder"

[2] " State of Georgia
"Fulton County

"Know all men by these presents that I, Thomas B. Neal, a resident of the City of Atlanta, State of Georgia, bargain, sell, transfer, and deliver to Thomas Crichton, a resident of the Parish of Webster, State of Louisiana, my one-third and undivided interest, in the following described Lands situated in Webster Parish Louisiana; to wit:—the East ½ & S.W. ¼ and S.W. ¼ of N.W. ¼, and Lot 17, Sec. 7; containing 520 $^{71}/_{100}$ Acres: Lots 11 & 12, and N.W. fractional ¼, West ½ of N.E. ¼, South ½ of S.E. ¼, and S.E. ¼ of S. W. ¼ Sec. 8; containing 424 $^{64}/_{100}$ Acres; South ½ of S.E. ¼, and N.E. ¼ of S. E. ¼, N.E. ¼ of N.E. ¼, and S.E. ¼ of N.E. ¼ Sec. 6; containing 153.$^{98}/_{100}$ Acres; Lot 13, South ½ and N.W. ¼ of S.W. ¼, the West ½ of S.E. ¼, and S.W. ¼ of N.E. ¼ Sec. 5; containing 234 $^{30}/_{100}$ Acres: the East fractional ½ and Lots 5 & 8 Sec. 19,; containing 277 $^{78}/_{100}$ Acres;, all except Lots 5 & 12 Sec. 18; containing 527 $^{71}/_{100}$ Acres, North ½ Sec. 17; containing 313 $^{72}/_{100}$ Acres.

"The North ½ of the North ½ sec. 24, T. 18 N., Range 10 West, and Lots 3, 4, and 2 in sec. 19, T. 18 N., Range 9 West; containing 296 $^{90}/_{100}$ Acres, except Right of Way of V. S. & P. R. R. 40 Acres off: making a total of 2709.-$^{74}/_{100}$ Acres, more or less.

"The consideration of this sale is the sum and price of One Thousand and Sixteen Dollars and fifteen cents ($1016.-15), cash in hand, the receipt of which is hereby acknowledged; this being at the rate of One Dollar and twelve and one-half cents ($1.12½) per acre for my one-third interest in the above described property.

"This done and signed in the City of Atlanta on this 17th day of October, 1900, in the presence of the subscribing witnesses.

"Witness:
   "J. M. Dugger                 T B Neal
   "W. F. Manry

"Georgia,          ⎰ In person came J M
"Fulton County. ⎱ Dugger one of the subscribing witnesses to within, who be-

ton, the vendee. This latter original document was offered by both sides, but particularly by the Saucier side, though for the restricted purpose of showing that the Crichtons have no title whatever to the property involved.

The chief deputy clerk for twenty-eight years of the 26th District Court, Webster Parish, testified that, prior to the year 1916, deeds under private signature, after being recorded, were delivered to the vendee. This explains how Mr. Crichton, Sr., had the possession of the original deed—Neal to Crichton, 1900.

The first difficulty is as to the following language at the very beginning of the description: (a) As appearing in the recorded copy: "East ½ of S.W. ¼ and S.E. ¼ of N.W.¼ and Lot 17, Sec. 7; containing 520.71/100 acres" and (b) as appearing in the original in the possession of Mr. Crichton, Sr.: "East ½ & S.W. ¼ and S.E. ¼ of N.W.·\¼, and Lot 17, Sec. 7; containing 520 71/100 Acres".

We must read this description so as to arrive at the content of 520.71 acres, because in this deed there are six specifically exact acreage contents given at the conclusion of specific governmental description, all to the accuracy of the hundredth of an acre. A sum is then given of the whole, to-wit: "2709.74 acres, more or less". To show further exactitude of acreage content, and also of price, there is the paragraph in the document reading as follows: "The consideration of this sale is the sum and price of One thousand and sixteen dollars and fifteen cents ($1016/15) cash in hand, the receipt of which is hereby acknowledged, this being at the rate of one dollar and twelve and one-half cents ($1.-12½) per acre for my one-third interest in the above described property."

The above facts being true, and admitting that a third party, with or without knowledge, is placed on guard immediately that there are only 124.52 acres, from the description, and not 520.71 acres, as specifically required, where would a prospective buyer and a professional abstracter (Mr. Saucier is that) or anyone else, go to ascertain the nature and source of this evident mistake? One would go to the previous sales of the same property to make a comparison of the description and acreage content.

When we go to the sale by William Bogel to Thomas B. Neal (when Neal bought the whole of this property), the language is as follows: "Township Eighteen, North, Range Nine West, to-wit: The East half, South West quarter and South East quarter of North West quarter, and lot Seventeen of Section Seven, containing Five hundred and twenty 70/100 acres (520.70/100)."

■ There we see that there is a comma that follows the words "East ½" and not an "of" as is shown in the recorded instrument, and not the symbol "&" as shown in the original instrument kept by Mr. Crichton. But the comma does away with the "of" concept; it is the equivalent of an "and".

■■ And right here Mr. Saucier, the subsequent buyer, or Crichton, or anyone in the world, would have been informed and straightened in two other imperfections of this instrument which we must interpret within itself, having no recourse to oral evidence. These two points are that, in this language quoted, the township and range are given, which happen to be omitted altogether in both the first paragraphs of the recorded instrument and the Crichton, Sr., original. The other imperfection detected is that the sum of the acreage is 520.70 and not 520.71 acres.

Also, by reference to another anterior title, that is, the one in 1879 when William Bogel originally acquired from Succession of Hyams, the description, we find, is as follows: "Township Eighteen North Range Nine West to-wit: The East half South West quarter and South East quarter of North West quarter and lot seventeen of Section Seven containing five hundred and twenty 70/100 acres."

The same clarification comes to Mr. Saucier or any other of the general public that a township and range are now shown, that the content is exactly 520.70 acres, and that it is the East ½ plus the S.W. ¼ that are there indicated to make the 520.70 acres. The statement is made by counsel for Saucier that Mr. Neal as owner could sell

---

ing duly sworn, says he was present and saw T. B. Neal sign within Deed and that he signed same as a witness in the presence of T. B. Neal and the other subscribing witness.

"(Seal)        "W. F. Manry,
N. P., F. Co., Ga.

"(Endorsed) Filed for record Oct. 22/1900, J. H. Tillman, Clerk D. C. and Ex Off Recorder

"Duly recorded in Conveyance Record vol 10 pg. 435 and 436. Oct. 27/1900

"J A Colbert Dy Clk D C & Ex off Recor chg on a/"

his property as he saw fit, and could have sold "the East ½ of the S.W. ¼" because he did own the whole of the S.W. ¼. We grant that to be true, but such was not sold in a sale where exact descriptions of governmental surveys are given, with repeated sub-totals of acreages, where the general total acreage is given and, also, the price per acre and the whole consideration. The description must cede reasonably to establish the total, and reference to these previous sales gives immediate and arithmetically conclusive answer as to how the error, slight in fact, but gross in effect, occurred in the description necessary to make the total acreage.

Similarly, in the same practical manner, anyone intending to deal with the property after the Crichton sale had the direct or implied knowledge that in the sale from Neal of the one-third of this property to A. Goodwill in 1887, the description is as follows:

"* * * North Western District of Louisiana in Township Eighteen North Range Nine, West.

"The East half South West quarter and South East quarter of North West quarter and lot Seventeen of Section Seven, containing Five hundred and twenty & 70/100 acres. (520 70/100) Lots Eleven Twelve the North West fractional quarter the West half of the North East quarter the South half of South East quarter and South East quarter of South West quarter of Section Eight containing four hundred and twenty-four & 64/100 424 64/100."

This is the third proof that the total of 520.70 acres is reached by the addition of the "East half" to the "South West quarter" and that the "East ½ of S.W. ¼" is a mistake.

There is a further decisive argument. It is one arithmetically inevitable in the interpretation of this deed from Neal to Crichton, not to be gathered by oral evidence, but found strictly in deductions made from its language, and all within the four corners of the instrument.

The Parish of Webster is free of Spanish or French grants. It was surveyed under United States governmental supervision. The Surveyor General surveys for the Parish of Webster made in 1837 are on file in the alienation records and are a notice to the world. The anterior records (three in number) show that Township 18 North, Range 9 West, is the description of the Neal property. Then a reference to the Surveyor General's map of this township and range will disclose that Section 7, using the description "East ½ plus" and not "of", was intended because of the total of 520.70. Why? There is the following immediate computation to be gained from this map, using Section 7:

Section Seven

| | | Acres |
|---|---|---|
| "East 1/2" | 40.84 x 6 | 245.04 |
| | 34.13 x 1 | 34.13 |
| | 35.33 x 1 | 35.33 |
| "Lot 17" | | 2.00 |
| "S.W. 1/4" | 40.84 x 4 | 163.36 |
| "S.E. 1/4 of N.W. 1/4" | 40.84 x 1 | 40.84 |
| | | 520.70 |

As a further corroboration that it is Township 18 North, Range 9 West, and not Township 18 North, Range 10 West (the "10 West" being borrowed from the second paragraph of the description of the deed, which the recording officer failed to show as a second paragraph, but joined to the first paragraph), any buyer after Crichton could check the next description on the same governmental map, the description giving 424.64 acres in Section 8, and the following result is found:

ish covering Township 18 North, Range 10 West, and going to Section 7 thereof, said that in Section 7 of that range there were no lot numbers, nor were there any lot numbers in Sections 8, 6, 5, 19, 18, and 17. The reason why these particular sections are shown to be without special lot numbers is that they are the sections stated in the deeds. In the deeds, these sections are shown including special lot numbers.

We should insert here that the original deed urgently placed on file by counsel for

## Section Eight

| | | Acres |
|---|---|---|
| "N.W. fractional 1/4" | 36.22 x 1 ................ | 36.22 |
| | 39.94 x 1 ................ | 39.94 |
| | 56.92 x 1 ................ | 56.92 |
| "Lot 11" | 58.35 x 1 ................ | 58.35 |
| "Lot 12" | 34.87 x 1 ................ | 34.87 |
| "S.E. 1/4 of S.W. 1/4" | 38.72 x 1 ................ | 38.72 |
| "South 1/2 of S.E. 1/4" | 39.84 x 2 ................ | 79.68 |
| "West 1/2 of N.E. 1/4" | 39.94 x 1 ................ | 39.94 |
| | 39.90 x 1 ................ | 39.90 |
| | | 424.54 |

For many years, in fact, for over forty years, the Crichtons, father and son, were under the honest belief that they owned the two-thirds of the Neal property, after the first third was sold to the Goodwills. They were under the impression that the language in the deed "my ⅓ and undivided interest in the following described Lands situated in Webster Parish, Louisiana," meant his whole undivided interest. None of the Neals, nor the purchasers from them, ever made claim to the property or any of its revenues since the year 1900. It is only after the government taking for the Minden Shell Plant that Saucier became a purchaser for $400, without warranty of title or recourse as to purchase price, in the year 1943, that we erroneously described as the purchase of a litigious right, and were corrected by the Circuit Court, that there has been any claim made contrary to the Crichtons' claim of the whole.

These conclusions we have made come readily to anyone examining the Government maps of Webster Parish and comparing therewith the deed of record, without the need of any oral evidence. However, there has been expert evidence offered to reach the same conclusion.

The chief deputy clerk in Webster Parish for over a quarter century, after being presented with an official map of Webster Par-

Saucier shows the description of all the property involved in two paragraphs—the first paragraph mentioning no township or range, the second paragraph mentioning "Township 18 N., Range 10 West, and Lots 3, 4, and 2 in Sec. 19, T. 18 N. Range 9 West."

A mistake was obviously made by the recording clerk, when the Neal-Crichton deed was filed, in making one paragraph of the first two paragraphs of the original. The original shows that no township or range was given in the first paragraph of description of land, and a township and two ranges (10 and 9) were given in the second paragraph. Since Range 10 is the first given, when the two paragraphs are copied as one, by context, all the property described in the first paragraph is inferred to be in Range 10. So, our reason to examine Range 10 on the Government map on file.

Next the witness took the Government survey map for Township 18 North, Range 9 West, and that was after the Court had very likely erroneously kept this expert witness from answering the question: "After having had twenty-eight years experience in the Clerk's office of Webster Parish, Louisiana, did you have any trouble as Deputy Clerk of Court in ascertaining the location of that land?" (the inference

being clear that it was the land described in the deed at issue).

He showed, later, in answer to the Court's direct questions, that in Section 7 in Range 9 West, there was a Lot 17, containing two acres; that on the map of the same Range 9, in Section 8, there were Lots 11 and 12; that in the same Range 9, there was in Section 8 the "N.W. fractional ¼" containing 56.92 acres; that in the same Range 9 there was in Section 5 lot 13, containing 5.45 acres; that in Section 19, same Range 9 map, there was the "East fractional ½" and also Lots 5 and 8; and that in the same range 9, in Section 18, there were Lots 1, 2, 3, 4, 5, etc., in consecutive order to include 14. It is only in Range 9 that these many lots exist; nowhere else in Webster Parish can they be—by the recorded United States public maps.

Then the Court asked the witness to make the computation for acreage, using the official map of Range 9 recorded in Webster Parish, of the "East ½ & S.W. ¼ and S.E. ¼ of N.W. ¼, and Lot 17, Sec. 7". The witness made the computation, and his answer was 520.71 acres. This proved to be only one hundredth less than what the actual deed described. The Court surmises, with its ready imagination, looking at the original, that Mr. Neal of Atlanta, Georgia, probably typing himself the sale to Crichton, had the figure "100" in mind to write right after he was to write "70", typed a "1" instead of a "0" in the figure "70" because the "1" was coming up, right next, in the figure "100".

The same expert witness then testified that if you took the description as "East ½ of S.W. ¼ and S.E. ¼ of N.W. ¼" the total would be 122.52 acres—a shortage of approximately 400 acres from the total acreage given in the sale of 520.71 acres.

Only in Range 9 West of Township 18 North in Webster Parish are there lot numbers (all caused by the meanderings of Bayou Dauchite (Dorcheat) in Section 8, Section 5, Section 19 and Section 18. It is not solely because a Lot 17 is found in Section 7, but also the discovery of lots, and with the right numbers, in the additional sections of this Range 9 West that the total proof becomes unerringly correct. Bear in mind that the acreages from the lots on the map go to add the correct totals of the deed of record.

The map of Township 18 North, Range 10 West, shows no lots in Sections 7 and 8 —and Bayou Dorcheat does not run, through it.

The present Parish surveyor of Webster Parish, who has served in that capacity for over twenty years, testified from the map of Township 18 North, Range 9 West, that there were lot numbers in Sections 5, 6, 7, 8, 17, 18, and 19, all caused by the meanderings of the bayou—some being large, and some being small, as the necessity of surveying demanded. He testified that Township 18 North, Range 10 West, had no lot numbers in these corresponding sections. The Court, in the case of the surveyor, there being no objection raised, permitted the expert to answer, after he had read the Neal-Crichton deed which it is our duty to interpret, the question:

"Q. In examining this deed from the lot numbers placed thereon and the number of acres given in the deed, is there any doubt in your mind as to where this land is located? A. No, sir.

"Q. Where is it located? A. I would say it is in Township 18 North, Range 9 West.

"Q. Without any question? A. Yes, sir.

"Q. And you get that information from the records of Webster Parish? A. From this map.

"Q. Which is on file in the office of the Clerk of the 26th District Court, Webster Parish, Louisiana? A. Yes."

This expert positively stated that the first paragraph of the deed does not have any township or range specified in it. This witness also testified that, after an examination of the records of Webster Parish, he found that Mr. T. B. Neal never owned any properties in Sections 5, 6, 7, 8, 17, 18, or 19, in Township 18 North, Range 10 West.

From the recorded instrument, because there is but one paragraph instead of two paragraphs as in the Crichton original, there is not much to be drawn contextually. The reason is that a period is the punctuation mark at the end of where the first paragraph ends in the recorded instrument. The description immediately next, which of course is the description at the beginning of the second paragraph of the original

document, gives "Sec. 24, T. 18 N., Range 10 West". From the fact that a period precedes this reference, by no stretch could it be said that all of the description preceding, wherein no township or range is given, would contextually be held to be in Township 18 North, Range 10 West. The period as a punctuation mark severs as distinctly as if there were two paragraphs.

Since it was insisted by counsel for Saucier that the original document stay in the record for the purpose of showing an erasure, though no particular accusation was made as to anyone, we felt that this original served to show that there are two paragraphs therein and not one as in the Clerk's copy. There is no township or range given in the description of the property in this first paragraph; the second paragraph has a particular township and range mentioned. This proves beyond any doubt that the composer of the deed failed to put in a designation of township and range. Reference to the anterior deeds where unfailingly and clearly the township and range are given (Range 9) clinches the point.

Anyone acquiring from the records, when examining the deed of Neal to Crichton, in addition to what we have just developed to show that all of the property described without township and range would, of necessity, because of the lots mentioned, be unwaveringly directed to Section 7 of Range 9 West, would, of necessity, discern by examining the deed in 1879 from the Hyams Estate to William Bogel, that Township 18 North, Range 9 West, is inclusive of all the property described therein. Clearly and unmistakably, the property in the recorded deed wherein the same totals are found as in the Hyams-Bogel deed must conform to the description of this Hyams-Bogel deed.

Again, when you examine the deed of Bogel to Thomas B. Neal, you find that the whole property described in that deed ends with the exact language of the recorded deed, up to the period preceding the following language, to-wit: "North ½ Sec. 17; containing 313 72/100 Acres." So this is additional corroboration for the conclusion we have made as to what was the property conveyed by the recorded deed, to be ascertained without the use of oral evidence to vary, alter, or contradict its meaning. All these conclusions make its meaning as strong (because there are so many repeated affirmations from different sources) as if the deed had been faultlessly composed.

The Crichtons get their property because the deed gives it to them; they need nothing more; the application of the ten-year prescription based on possession in good faith upon a title translative of the property merely rivets the title down. Saucier or his antecedents never exercised possession to the slightest degree, in any form or manner.

We rule, therefore, that the deed is translative of property and is translative of the specific property described therein as if the word "of" were not in the recorded instrument, and that it is translative of the property described in the deed as being located in Township 18 North, Range 9 West, to the words, "The North ½ of the North ½ Sec. 24", and in the total acreages given by the vendor in the deed. The description includes totally the property at issue.

We believe that the instrument affords ample and sufficient description by which the property can be identified, either through the description directly in the deed itself, or by means of extrinsic but competent evidence. Snelling v. Adair, 196 La. 624, 199 So. 782, and all cases cited therein; Harrill v. Pitts, 194 La. 123, 193 So. 562; Willis, et al. v. Ruddock Cypress Co., Ltd., 108 La. 255, 32 So. 386, 387. This gives the Crichtons the one-third of the lands.

It follows also that the character of ownership and possession as described pretty fully in this opinion, though insufficient to support the plea of prescription of thirty years, is superabundantly sufficient to support the plea of prescription of ten years, based upon a title translative of property, with the vendee in absolute good faith.

█ The corporeal possession of this property began long past thirty years before the taking of the property by the Government and there was repeated and continued possession under the Civil Code to keep the prescription "acquirendi causa" running for a period of ten years. Each of the several general cuttings of the timber over the whole property is the basis of physical possession, on which all the other facts proved, such as paying taxes unfailingly, leasing, numerous minor cuttings of timber, etc., serve to constitute the "civil possession" necessary to maintain the ten-year prescription. Revised Civil Code, Articles 3442, 3443, 3478, 3487; Chamberlain v. Abadie, 48 La.Ann. 587, 19 So. 574; Screen v. Trainor, 172 La. 51, 133 So. 359. See

also, Leader Realty Co. v. Taylor, 147 La. 256, 84 So. 648.

It is very clear that Mr. Neal, the vendor, was conveying a specific number of acres, to-wit, 2,709.74 acres, at the specific price of $1.12½ per acre, and actually the total of "$1,016.15 cash in hand" was stated. Since a deed is prima facie an expression of the intention of the grantor, the Courts, in construing ambiguous, uncertain, or repugnant descriptive terms therein, will give them a construction against the grantor and favorable to the grantee, with respect to the quantity of land conveyed. See 16 Am.Jur. 599. This we have in justice done, and in our opinion no one could be or was misled by the instrument to a different conclusion than the one we have reached. The description directed step by step, clearly and unfalteringly, to the right solution.

All the cases cited by counsel for Saucier, such as Albert Hanson Lumber Co. v. Angelloz, 118 La. 861, 43 So. 529; Bruce v. Holstein, La.App., 151 So. 810; Salmen Brick & Lumber Co. v. Weston Lumber Co., 144 La. 186, 80 So. 249; Bendernagel v. Foret, et al., 145 La. 115, 81 So. 869; Matthews v. Olla State Bank, 164 La. 463, 114 So. 98; Dawidoff v. Roxana Petroleum Corporation, D. C., 2 F.2d 370; Nelson, Curtis & Nelson, et al., v. Bridgeman, 152 La. 190, 92 So. 855; Sessions, et al. v. Tensas River Planting Co., et al., 142 La. 399, 76 So. 816, are inapplicable—the facts here not warranting the application of their legal conclusions.

The Crichtons have pleaded prescription of thirty years in their favor under Article 3499 of the Civil Code which provides that the ownership of immovables is prescribed for by thirty years without any need of title or possession in good faith. Article 3500 provides that the possession on which this prescription is founded must be continuous and uninterrupted during all the time, that it must be public and unequivocal, and under the title of owner.

Article 3503 of the Civil Code is of major importance on this point and is quoted in full: "How favorable soever prescription may be, it shall be restricted within just limits. Thus, in the prescription of thirty years, which is acquired without title, it extends only to that which has been actually possessed by the person pleading it."

Since the possession by the Crichtons for a period of thirty years is contained in their constructive ownership of the two-thirds interest, in indivision (the Goodwills were in the ownership of the other one-third interest, in indivision), and that consequently these two interests were undivided from the beginning and remained undivided until the taking of the property by the Government, we think such an ownership prevents, logically and legally, the Crichtons from prescribing in the possession of an undivided two-thirds interest. One either possesses the whole actually, or one possesses an undivided interest constructively. The Crichtons may not contend that they had the undisturbed, uninterrupted, public and unequivocal possession in this status of ownership with the Goodwills. Two possessions of the same rank and character cannot be co-existent. Mower v. Barrow et al., 16 La.App. 227, 133 So. 782.

But we may be wrong in this position, and since we are not an appellate court, if the above conclusion were declared to be erroneous, we must and shall continue further with the opinion.

What is the next point? We grant the premise previously developed that Saucier by his deed purchased nothing in fact on October 31, 1923, from Mrs. Ida F. Neal because Mrs. Ida F. Neal had already sold her whole interest to Mrs. Emma Neal Douglas Chandler by previous sale for $33,000 on January 8, 1903, recorded in Fulton County, Georgia, July 18, 1903, but recorded only on November 18, 1942, by Saucier, in Webster Parish. Saucier is impugned with the notice of this sale dated in 1903 when he supposedly bought, for he remained silent on the point—never took the witness stand. His pleadings Article 1 (e) says:

"And that said chain of title showing said ownership is as follows:

"* * * Deed, Mrs. Ida F. Neal to Mrs. Emma Neal Douglas dated January 8th, ———, filed for record in the Conveyance Records of Fulton County, State of Georgia, July 18th, 1903, and filed for record in the Conveyance Records of Webster Parish, Louisiana, on November 18th, 1942."

This left the Crichtons co-owners with Mrs. Emma Neal Douglas Chandler, or her successors in title, to the time of purchase by Saucier on August 24, 1942, from the

554

Wachovia Bank & Trust Company, trustee, when Saucier himself supposedly by this title became co-owner of the Crichtons.

The next query, therefore, is: May the Crichtons, owners of one-third, under the Louisiana law, prescribe as to undivided property against their constant and successive co-owners of the other one-third (the Goodwill one-third not considered) from the year 1900 to the date of taking of the property by the Government?

■ We rule again that one co-owner cannot prescribe against the other co-owner. Liles et al. v. Pitts et al., 145 La. 650, 82 So. 735. In ruling thus, we fail to see that the possession by Crichton was hostile to his co-owners in such a way as to prove an exception to this rule of law. It may be, however, that the Crichton possession, by paying taxes, selling timber, leasing for fishing and boat-riding, for oil and gas exploration, are such manifestations of adverse possession, as to constitute the hostility required by the law for the exception. Considering that this second ruling by us may be erroneous, we must now proceed further and establish the facts of possession in the Crichtons from their deed from Neal in 1900 to the day of taking by the Government.

Examination of the map, Crichton 30, mutually accepted by the Court and both litigants, will show that Tracts A-12, A-38, and D-1 at issue here (all shaded red on the map) are located to the West of Dorcheat Bayou, and between the Louisiana & Arkansas·Railway to the north and the Illinois Central Railway to the south. The north and south width of these properties is practically three miles; there' is another mile of property to come to the north to make the distance between the two railroad tracks. This latter extra property is out of the area taken by the Government, but we understand is likewise at issue because it is under the same title and the same ownership as the three tracts with which we are working here.

The next general mental view we get from this map, Crichton 30, is that the Crichtons had two other tracts taken by the Government to the west of these three tracts at issue, to-wit, D-28 (66 acres) and A-2 (117 acres), and also own a substantial acreage south of the Illinois Central line, not taken by the Government for the Minden shell plant.

None of these lands was ever fenced by the Crichtons, the Goodwills, or anyone else. In the run of the years there have been fencings to the west of the Crichton holdings by nearly all of the adjacent owners of these three large tracts, as shown by the evidence in the record, except in two little gaps a quarter mile each. This fencing of the Crichton property accomplished by others, with the two gaps, has not been of thirty years' standing, but has been the result of strip by strip fencing in the run of forty years. The Court had envisaged the thought that the property had been delimited to show open and notorious possession to the world in that the Dorcheat Bayou was a fixed natural mark all the way along the east, the Louisiana & Arkansas Railway on the north, then the fences by the adjacent owners to the west, and finally the fourth boundary to the south fixed by the I.C. Railroad. The weakness in this is that the fencing on the west was by other owners and not by the Crichtons. Another weakness is that in the two quarter-mile gaps there has been no closing for thirty years or more.

We had thought further that since police juries in our highly developed parishes were establishing no-fence laws, that the late decisions of our Supreme Court had reflected favorably such parochial action, and that the former jurisprudence of the necessity of an established fencing or marking, or actual residence, to establish possession against the world, had been departed from, but in the case of Tillery v. Fuller, 1938, 190 La. 586, 182 So. 683, 694, we find the following: "The evidence of the defendants' actual possession of the 240 acres of land is hardly sufficient to sustain the plea of prescription of 30 years, acquirendi causa, under articles 3499 and 3515 of the Civil Code, because the fences that surrounded the land—particularly the wood land—were allowed to decay, and, in some instances, to disappear, after a local law or ordinance went into effect, forbidding the owners of cattle to allow them to run at large."

A resident of the vicinity for thirty-one years, since 1911, engaged in the timber and mercantile business, testified that in the spring of 1914 he operated on Mr. Thomas Crichton, Sr.'s, property, cutting timber on the lands west of Dorcheat Bayou, cutting on both sides of the railroad, and the cutting continuing for four years; that he

knew Mr. M. D. Saucier for twenty-five or thirty years and neither he nor anyone else objected to his operation; that he had a mill on the spur of the railroad track; that he cut north of the Illinois Central clean back north to the L. & A. Railway line; that he cut in Sections 18 and 13 of the area involved, or up to a mile from the L. & A. Railroad and following Dorcheat Bayou on the west side; that some of the property at that time was fenced in by the owners to the west; that his mill was not on the property of the Crichtons at issue, but on Crichton holdings not at issue. Under cross-examination he clearly identified having cut in Sections 18, 7 and 6. He stated that as a whole the property is not fenced; that the selection of timber was at his own discretion, and it was pine; that the land was surveyed. He characterized the country as open free range—swamp land near the Dorcheat Bayou and all timber cut was pine and hardwood; that the cutting at his mill was three-fourths Crichton timber; that he cut timber all over the area west of Dorcheat Bayou and north of the V. S. & P. Railroad, and it was all Crichton's timber except that from Harvill's and Tom Stephens' small tracts; and that he cut west of Dorcheat Bayou about a mile and a quarter or a mile and a half. This distance to the west covers the three large tracts at issue.

The next witness lived in the area taken by the Government, immediately next to one of the tracts at issue—Section 13, Township 18, Range 10. He had lived in the neighborhood and his timber-cutting extended from 1918 to 1925. The area pointed to as cut by him was the same as shown by the previous witness. This is not surprising, as he worked under him. To the question as to whether he knew the Crichtons and Goodwill lands or not, he said: "I did, because no one else claimed the land I cut the timber on around in there and I know it was all Crichton and Goodwill land up to Dorcheat and to the I. C. Railroad and north, not all the way to the L. & A., but nearly about to the L. & A."

He further stated that the cutting extended from a mile to a mile and a half west of Dorcheat Bayou, and that to his own knowledge for thirty years no one but the Crichtons exercised dominion over the property; that the lines of the Crichton property were well-known and that most places to the west were fenced in. Under cross-examination, he stated that between the years 1918 to 1925 he cut all over the area marked in red on the map, a mile and a quarter west of Dorcheat; that all the fields on the west were fenced in by the different parties living there; that there was no land in cultivation on the Crichton holdings; that he worked each year a little better than a month, that his cutting was not commercially clean, but it took the cream of the timber; that he would employ workers to make cross-ties and poles and cut the logs from anywhere he could; that he believes he cut on every forty that is in the area; that there were survey lines established and he knew substantially well where the property was because of the established fenced properties to the west; that there were land lines, blazed tree hacks, and a corner mark at the end of quarters.

The next witness lived between Minden and Doyline, nearer Doyline, which is in the immediate vicinity of the property at issue. He lived in Section 14, Township 18, Range 10, for seventy-two years.

He testified that he knew the Crichton lands north and south of the Illinois Central, north and west of Dorcheat Bayou, knew the lines well between the two railroad lines and west of the Bayou; and corroborated the fact that Willis and Stephens had cut timber there during the years that they stated. He testified as to the existence of certain fences; that the Harvill place (A-11) was fenced as well as all the other tracts of land to the west of the area in red, which were identified by a pencil cross-mark, and that even where there were no fences there were big iron stobs at the section corners; that the property at issue has never been cleared up, has never been fenced by the Crichtons themselves and is open range, and that everyone in the vicinity raised cattle and hogs in the open area; that the cutting of trees, however, was well guarded against by Crichton, who had Mr. Stephens look after that for years.

The next witness had lived in Doyline on the I. C. Railroad for twenty-five years, keeping a small store; had lived in the neighborhood thirty-nine years. He stated that he knew the area as owned by the Crichtons and Goodwills west of Dorcheat Bayou and northwest of the Illinois Central; that living near to this timber tract and having his little store in the neighborhood he would hire resident cutters in the area, receive the logs and deduct the stump-

age, and remit to Mr. Crichton; that the cutting was from 1910 to 1915; that the land was known by everyone to belong to the Crichtons. He could not point to any particular forty, but said that the areas he cut from were here and there over the Crichton holdings. He paid to Crichton so much stumpage and he took the word of the cutter as to whose it was and had no objections from anyone. He would make advances to the cutters, and said the cutting was never over a mile and a quarter from Dorcheat Bayou, though he would buy sometimes from both sides of the bayou.

The next witness was seventy-two years of age and had lived fifty-two years near the Crichton and Goodwill lands, in other words, since he was twenty; he testified that he hauled ties for one M. M. Morgan and that Morgan had authority from Mr. Tom Crichton on the handling of the timber; that he does not know from which particular quarter section the cutting was made. The cutting was of the best trees, either pine or hardwood.

The next witness was one who is now president of the People's Bank & Trust Company, of Minden, but who in 1910 had a mill at Sibley, one-half mile from the Dorcheat Bayou; he testified that his company, the Delta Stave Company, made staves on the property aforedescribed, in the year 1910 and for thirteen years thereafter; that he was on the property all the time; that it was west of the bayou and that he cut on both sides of the Illinois Central Railroad, but principally to the north, cutting hardwood and pine, and that after three or four years of cutting he sold to Willis and Brown, but that there were no fences that he recalls about the property; that there was some cultivated land next to the Crichton property.

In the case of Little v. Barbe, 195 La. 1071, 198 So. 368, 373, the Supreme Court said: "The ownership of a tract of land not fenced or enclosed in any way cannot be acquired by the prescription of thirty years by the exercising of merely temporary and occasional acts of possession of only a part of the land, as, for example, by the occasional felling and removing of timber from the land. And the reason for that is that the prescription of thirty years cannot prevail beyond the area of land actually possessed or occupied by the party pleading the prescription. Rev. Civ. Code, Art. 3503; Prevost's Heirs v. Johnson, 9 Mart., O.S. 123; Ellis v. Prevost, 19 La.

251; Leader Realty Co. v. Taylor, 147 La. 256, 84 So. 648; Continental Land & Fur Co. v. Lacoste, 192 La. 561, 188 So. 700." Also see McCluskey v. Meraux & Nunez, La.App., 186 So. 117, and again at, La.App., 188 So. 669.

Mr. Donald Goodwill, one of the heirs of the Goodwill estate, testified that Mr. Crichton, Sr., and after his death, Mr. Tom Crichton, Jr., attended to handling the Goodwill share of the property at issue, and that the statements were furnished for forty years; that he received only one-third for the Goodwills.

The Crichtons have proved the payment of taxes by them on the whole property in indivision for every single year since the year 1900 to the time of taking by the Government. This is in their favor, but that alone is not sufficient indicia of possession for the acquisition of property under this thirty-year plea; it is much more effective and meaningful, however, under the ten-year plea, with title translative, in good faith, and with the itemized other items of ownership shown here, such as leasing for various purposes, repeated timber cuttings for forty years, surveying, recognition of Crichton ownership by all neighbors by their fencing to the Crichton property, etc. See Little v. Barbe, supra, headnote 13; Vance et al. v. Sentell, 178 La. 749, 152 So. 513, 515, headnotes 2 and 3.

As gas and oil development arose in the area, leases for such exploitation were granted as follows: (a) Thomas Crichton as owner of two-thirds, in connection with the Goodwills as owners of the other one-third, to the Bistineau Oil & Gas Company, 1,100 acres of the property on December 23, 1915; (b) in the same manner, by the same parties, to the American Oil & Gas Company, 1,100 acres on July 18, 1911; (c) the Crichtons alone to James P. Evans, 640 acres of the property as two-thirds owners, on March 15, 1934; (d) the Crichtons and Mrs. Olive G. Roberts to James P. Evans, 540 acres of the property involved herein, on March 15, 1934; (e) the Crichtons and one of the Goodwills, to J. Barry, 40 acres of the lands at issue, on March 10, 1922; (f) the Crichtons and Mrs. Ida V. Goodwill to James P. Evans, 240 acres of the lands at issue, on March 15, 1934; (g) the Crichtons and Goodwills to Gulf Refining Company of Louisiana, 360 acres, on November 17, 1919; (h) the

Crichtons and Goodwills to Bistineau Oil & Gas Company, 40 acres of the land involved herein.

We note that in all of the transactions Crichton appears as owner of two-thirds of the property, and invariably the property is in Range 9, and not in Range 10. These would again be multiple notices to any buyer like Saucier in 1942 (and, in fact, that is the only time he bought anything), that the bulk of the Crichton property was in Range 9 West and not in Range 10 West.

Mr. Thomas Crichton, Jr., testified that beginning in the year 1918 he was the trustee of the affairs of Thomas Crichton, Sr., deceased, and that he took care of the one-third share of the property of the Goodwills, as well as of the two-thirds share of the Crichtons.

In the year 1918 there were six sales of timber and two leases for the joint account of the Crichtons and Goodwills. The first lease was an oral one made to R. L. Jones on January 17, 1918, for a fishing site. The second was an oral sale of cross-ties made on April 10, 1918, to S. T. Anders.

For the year 1919: June 11, N. E. Wilson, who was operating for Burton Brothers Tie Company, 216 cross-ties, $27; August 2, Tom Stephens, 100 cross-ties, $10; August 7, N. E. Wilson, for Burton Brothers, 533 cross-ties, $66.60; September 13, T. E. Stephens, 700 cross-ties, $70; October 15, T. E. Stephens, 1043 pine and oak cross-ties, $122.87; November 7, T. E. Stephens, 510 pine and oak cross-ties, $52.50.

And on through the consecutive years, the witness gave dates, names of parties, subject of sale, and price, etc., and after the year 1924 had been given, it was mutually agreed that there had been, each year, at least ten to twelve timber sales from the Goodwill-Crichton lands from 1918 to the taking by the Government.

Under cross-examination, Mr. Crichton testified that there was a certain amount of timber taken every year from 1918 to the time of taking by the Government, but that there was not any complete commercial cutting of timber from all the land; that the sales were relatively small, to a number of persons every year, and extended for a period of twenty-five years whilst he was in direct personal charge, and that the same situation existed for twenty-five years before by and through his father.

Mr. Crichton testified that from and including the year 1905, after his graduation from the state university until he moved to Monroe in 1911, he was in active charge of his father's business. In giving his evidence he used the records to refresh his memory, and stated that from the year 1911 when he was in Monroe until he came back to Minden in 1918, by his frequent visits to Minden, the Crichton home, he also made the original records for that period of his father's business. Of course, from 1918, the year of his father's death, to the day of the taking by the Government, he was the trustee of the Crichton interests.

He admitted that the property had never been put under fence as a unit; that he did not believe any of the Neal-Crichton and Goodwill land was in cultivation at the time of the taking of the property for the Minden Shell Plant. The property, however, had been almost completely fenced by adjoining owners. He further stated: "There was no occasion to fence the property. It is not the type of property that a person ever fences. * * * Timber land is never fenced, unless one wanted to use it for some particular purpose." He said the property had never been used as a pasture or for grazing, but that it was subject to grazing by the animals of the general public.

Mr. Crichton stated that from 1905 to 1911 his father exercised over the land west of Dorcheat Bayou and between the two railroads the same type of dominion that he had exercised since the death of his father in 1918. He knew that to be true from the books of his father, which served to refresh his memory. Mr. Crichton said that between 1911 and 1918, when he was away, from his knowledge of his father's business, his father had exercised the same control over the property as he, the witness, had exercised after his father's death. He said: "I checked his books from 1909, and can give an itemized statement of every piece of timber sold by my father from 1909 until the time I took it, and from the date I took it until the present time." Counsel for Saucier stated: We are perfectly willing to stipulate that from the time Mr. Crichton took possession until the Shell Plant took over, the average number of sales of timber were of the character he has previously detailed."

Mr. Crichton testified that since 1918 he possessed this property and exercised ownership over it as two-thirds Crichton estate and one-third Goodwill; that remittances were made to the Goodwills accordingly

for some forty years, either by his father or by himself.

The Court is satisfied that the witness disclosed the full and accurate statement as to sales and general conditions of ownership from 1905 until the taking by the Government. The witness, after saying to the Court that: "The books have been in my possession since my father died, and during the period of years I lived in Monroe, from 1911 to 1918, I was constantly back and forth on visits all during the time, and I would always be at my father's store assisting him as much as possible, and in that way I was more or less familiar with his business during the period of years I lived at Monroe. I was there, I would say, at intervals that never exceeded more than three weeks at one time, and often every weekend I would come back to Minden", using the books of his father, showed a complete history of all sales of timber made by Thomas Crichton, Sr., giving date, name of party buying, amount received, nature and quantity of timber, etc.

On cross-examination, in answer to the question: "Mr. Crichton, you have given a number of sales here of odd-lot cross-ties, staves and things of that kind. Can you on any occasion, giving the date and the person, tell me from what part of this property that timber was located—of your own knowledge—on any one of the numerous sales?" Crichton said, "On a sale such as that made to Willis and Brown, their right was embraced by the whole area. They were given the right to cut the timber over the entire area. So was the Pine Woods Lumber Company. So was any one of the tie makers. They were given free leave to go into the area as a whole, and make ties wherever they found timber suitable." To the next question: "What I am asking is, of your own knowledge can you tell me on what day, on any day, taking all these numerous sales of cross-ties, staves, lumber, saw logs—if you can tell me on any day of any month where so-and-so cut timber off a certain part of this property, and if so what was the description of that part of the property where it was cut off. You don't know that information, do you?" he made the following answer: "I know that between the dates of September 13, 1919, and October 15, 1919, that T. E. Stephens made eleven hundred forty-three cross-ties somewhere in that area. He was given the right to manufacture cross-ties, not with reference to any forty or any

eighty acres, but to manufacture cross-ties on any part of this whole property."

Then finally to the question: "Now, these several timber sales you have alleged were of your own knowledge, from 1918 on up to date. Do you know that any of that came off this particular three tracts of land the Louisiana Ordnance Plant took in this condemnation proceeding, or whether it came off other parts of this twenty-six hundred acres of land that you owned with Mr. Neal?" he made the following answer: "When sales were made, the privilege was given to manufacture timber on the whole tract of land, the bulk of the land being located west of Dorcheat Bayou, and knowing that timber was removed from various parts of the tract at all times, my answer would be that the bulk of the timber removed during any one month or any one year would necessarily have to be removed, as to the larger part, from lands embraced by the Shell Plant area."

The Court feels that the whole of the cross-examination of Mr. Crichton should be placed in the record, as follows:

"Q. Is it possible then, for you to know of your own knowledge of any cutting and any moving off of a given area on a given date; and if so, please so state, of your own personal knowledge, not reflected by your books. A. Well, I had men cutting timber from this land, and making ties. They would come to me and make reports of their removals and make settlements with me for those removals. I accepted their statements as being true. I did not see every tie manufactured and did not see every log hauled off the land.

"Q. Did you see any of it? A. I didn't see any tie manufacturing, and didn't see any log hauling off the land. I did check cross-ties that were manufactured by Mr. M. M. Morgan between the years 1905 and 1911, because my father, Thos. Crichton, Sr., had reason to feel that a check was necessary. In none of the men that we have dealt with since—all well and personally known to both my father and me—did we feel it was necessary to check the type of men we were doing business with.

"The Court: Referring to your visit to the premises at that time, when you were a young man out of college, could you indicate what sections or what spot that was at that particular time?

"The Witness: It was on the west side of Dorcheat Bayou, north of the Illinois

Central Railroad, in what is now the Shell Plant area.

"Q. There are three or four sections in there. Could you say what section it was? A. I wouldn't know. I was a boy, and I was given the information that my father owned practically all of that land, he and Captain Goodwill, and that Mr. Morgan was familiar with the property and could show me where he was making ties, and I was directed to go down and count the stumps, and check by the newness of the stumps and the number of the ties, whether Mr. Morgan's account was correct. And I did that on several occasions.

"Q. At that time you relied on Mr. Morgan to show you the line? You didn't know the line, did you? A. It was hardly necessary to know the line. I knew the people who lived in there, and knew they were landowners themselves, and bordering on their property I knew was this area. It wasn't difficult to discern the area because, as we have brought out, it was a timbered area strictly; no one lived on it; no one had ever lived on it but Mr. M. M. Morgan; and no one has ever lived on it since. Anyone today could be directed to that area very successfully without having any information particularly, with reference to land lines.

"Q. So you relied then on the natural geography, so to speak, and the fact that certain other lands which you thought adjoined your land were enclosed? A. I was familiar with the names of all the people that lived along the west side of this area.

"Q. Mr. Crichton, could you go down there today, after all this experience you have had with this property, and walk the surveying lines of this property? Do you know where they are? A. Pretty well.

"Q. Accurately enough to walk them and say, 'This is my line'? A. Whatever I didn't include in my survey I would be willing to give to you free.

"Q. I am not asking for that—A. I would be willing to say that I know enough about that area from the trips I have made there, to know that land and know where it is. I have looked at it on the map a thousand times, have checked with people on oil leases, have gone over it with Mr. Stephens and other timber men for nearly twenty-five years on an average of a hundred times a year—because different people buying ties would want to know where

he was going to make them, and satisfy themselves he wasn't going to make them on the other fellow's land.

"Q. Have you ever had the boundaries of this land surveyed? A. Not as a whole.

"Q. Let's get the outlook of this land to the Court: This land comprised, when you and Mr. Neal owned it in common, how many acres? A. I would have to refer to the record. I would say, just off-hand, twenty-four or twenty-five hundred acres.

"Q. And part was located west of Dorcheat Bayou and north of the Illinois Central? A. That's right.

"Q. And part was west of Dorcheat Bayou and south of the Illinois Central? A. That's right.

"Q. And part was east of Dorcheat Bayou and north of the I.C.? A. That's right.

"Q. And part was south of the I.C. and east of Dorcheat Bayou, on down toward Lake Bisteneau? A. That's right.

"Q. It was consequently divided into four separate and distinct tracts by virtue of the railroad and Dorcheat Bayou? A. That's correct.

"Q. So that whenever you would sell timber—when these people would come in to pay you for ties, you were not able to say whether it came off that part south of the I.C., north of the I.C. east of Dorcheat, or west of Dorcheat, were you? A. At the time the ties were manufactured I probably knew, and I would say now that I did know.

"Q. But do you know now? A. No sir, and no one else could say after this length of time.

"The Court: At that time, the time they were being exploited, you think you could tell which quarter it came from? A. Had the question been asked me then I could tell in what locality the time maker was working, but on my books I made no record of that; didn't dream there would ever be any necessity for knowing what particular day certain ties were made or from what particular forty acre tract of land they were removed.

"Q. I notice you make some mention of R. L. Jones. Do you know him? A. Quite well.

"Q. Something about renting a fishing camp. His camp was not located in the land involved in this lawsuit which has been condemned, is it? A. It was at one

time, and at another time it wasn't. When Mr. Jones leased that land from me it was distinctly understood he had all and exclusive rights on the whole property facing Dorcheat Bayou, and that I would not lease fishing grounds to anyone else during the time he had it. He patrolled that stream and kept everybody from using that property for the purpose he was using it. He rented boats to people who wanted to fish, and no one else could establish a camp anywhere on the banks of that stream, north and south.

"Q. His camp was how far from Sibley there on the east side of Dorcheat Bayou? A. It was at no time on the west side of Dorcheat.

"Q. It was below the I.C. bridge? A. Below.

"Q. Mr. Bob Jones never occupied a fishing camp on this property we are contesting here? A. The camp itself was not located in the Shell Plant area, but his rights extended to the west bank of Dorcheat Bayou.

"Q. Did you have your contract with Mr. Jones in writing? A. The original contract with Mr. Bob Jones was made with my father, and I continued the operation of that contract for a number of years, until the rentals became so unsatisfactory I had to have him removed. He didn't pay his rent, and the place became more or less of a questionable moral character. I had complaints from people about the type of camp he was running there, and I canceled the contract.

"Q. You can't tell us, then, on any occasion when this area of land we have under discussion here, where any person, on any given date, took a given number of trees off that property? A. My records weren't kept that way.

"Q. And consequently, if your records were not so kept, you don't know of your own personal knowledge? A. I could guess, but I am not willing to guess.

"Q. You couldn't describe the time, or any amount, to any degree of certainty at this time? A. Will you repeat that?

"Q. You say you would not like to guess. You admit you can not at this time give a given time that a given amount of timber was moved off this given land we are discussing here today? A. I can give one day that I believe to be accurate. There may be a number of others, but I see offhand from my records here, one day in which a settlement was made immediately following a previous settlement of the same day, by the same man; and I would have to assume that the removal—the second removal—was made on that particular day. Every indication would point to that conclusion.

"Q. What day is that? A. August 21, 1918. On August 21, 1918, Mr. Stephens made a settlement for a certain number of ties. He came back the same day and made an additional settlement for eighty ties, I would have to conclude from that entry that those eighty ties were removed on August 21, 1918; and I would have to conclude that they were made between the date of August 16, when he made his previous settlement, and August 21. That would be a period of five days within which he would have to have made those ties.

"The Court: Could you spot that removal?

"The Witness: No sir, it would be impossible for me to say what particular acre or what particular tract they came from.

"By Mr. Drew: Q. Could you say—assuming as you have—could you say on what quarter portion of this property—north and south of the Illinois Central and east and west of Dorcheat Bayou—could you even conclude or assume to say what quarter it came off? A. I don't think Mr. Stephens himself could say.

"Q. So far as you know, then, so far as giving particular ties—any timber removed off these three tracts of land the Government has taken—you are not able to give us any date and any figures when that was done? A. My statements would have to be confined to the whole area, as such.

"Q. Consequently then, Mr. Crichton, your testimony is primarily deducting from what your books reveal? A. It is the evidence, the only evidence, that a timber owner could give after a period of twenty-four years. I would question the evidence of any timber man who would tell me after twenty-four years that he moved a certain amount of timber off a certain parcel of land, unless he happens to own only that one tract of land. If he owned twenty-four hundred acres through which a number of people had been operating, and he told me he had removed a certain number of trees from certain acres, I would question his evidence.

"Q. From your books there, then, there was no differential made between the in-

come received from land north of the Illinois Central and west of Dorcheat Bayou, and that received from lands south of the Illinois Central and east or west of the bayou? A. It was a common ownership. There was no necessity from my standpoint of trying to distinguish it.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"By Mr. Drew: Q. When did you first find, Mr. Crichton—when did you first become aware of the fact that your deed from T. B. Neal of a one-third interest in the property did not in your opinion correctly describe the property? A. I have two recollections—of two different parties coming to me to discuss title to that land. One was in connection with the dispute that arose between Mr. A. D. Turner, of Minden, and myself, with regard to one lot of thirty-six acres located in the Shell Plant area. As I recall, that was some ten or fifteen years ago. I submitted the question to my attorney, Mr. L. K. Watkins, the father of my present attorney. He said—

"Q. Don't tell me what he told you; but you did submit it to your attorney then? A. Yes, sir.

"Q. Have you had occasion since that time to try to remedy that defect? A. The other instance was when M. D. Saucier came to me about twenty years ago. He was abstracting some property for me at the time, and he told me he thought there was a little shadow on some of the Neal titles, and asked me if I would object to his acquiring that interest from the widow Neal so that, in connection with his abstract business— he might perfect titles for the public generally; that he was not interested in owning the property and never intended that his interest should conflict with any of the deeds, but felt he could promote his abstract business if he could be in position to clear title for anybody that might own under Neal. I told him I didn't have any objection to him doing that, and afterwards he did that. And he came to me and said 'Any time any of this Neal land proves questionable from an oil company's standpoint I am in position to quiet their trouble.' A little later he came to me and gave me a letter he had written to my brother in New York, asking my brother's assistance to see Mr. Chandler, who was the husband of Mrs. Douglas. She had married two times. She originally was Emma Neal, and first married Mr. Douglas, then Mr. Chandler, who was in the automobile business in New York City, and knew my

brother quite well, and had been befriended by my brother in some financial transactions Mr. Saucier had heard about; and he thought my brother might be of assistance in getting Mr. Chandler to sign this deed in his favor; and gave me letters to send my brother, asking him to assist him in the matter.

"Q. Have you got that letter? A. It is in my files in Minden.

"Q. It has been about twenty years ago, then, that you first knew about that variance in description? A. About that time since Mr. Saucier told me that in his opinion there was some irregularity in some of the Neal titles.

"Q. And since that time the only other occasion was with Mr. A. D. Turner? A. Those were the only two times any one ever suggested to me that there was anything wrong with any title on any part of this tract."

We rule that under the jurisprudence (all the cases in this opinion for the authorities), the possession proved by the Crichtons does not warrant the support of their plea of prescription of thirty years on the one-third of the undivided property of which they do not have title, though we believe their possession from 1900 to the time of taking by the Government was in good faith.

The Crichtons have taken the position that the minor, Clarence Ashcraft Chandler, Jr., is barred from conveying the property at issue under the provisions of Article 1030 of the Civil Code, which reads as follows: "The faculty of accepting or renouncing a succession becomes barred by the lapse of time required for the longest prescription of the rights to immovables."

This article has been difficult of interpretation, but our Supreme Court, upon rehearing in the case of Harang v. Golden Ranch Land, Inc., 143 La. 982, 79 So. 768, in the year 1918, took a definite position and that position has been consistently maintained since.

At page 787 of 79 So. Justice Provosty said: "To our mind, the argument, in a nutshell, stands thus: A party cannot lose his title without at the same time some other party acquiring it. Until a party loses his title, or, which is the same thing, until some other party acquires it, there cannot possibly be any reason for not letting the title be ju-

dicially asserted. No one can pretend that ownership can be acquired by the prescription of 30 years without continuous, uninterrupted possession. Hence adverse possession during 30 years is necessary for depriving an owner of his right to assert his title judicially."

The doctrine was reaffirmed, Harang v. Bowie Lumber Co., 145 La. 96, 81 So. 769, and finally reaffirmed in the cases of Bendernagel v. Foret, 145 La. 115, 81 So. 869, and Tillery v. Fuller, 190 La. 586, 182 So. 683, which latter case has been followed to date. Article 1030 applies to testamentary heirs. See C.C. Art. 976. So, the plea fails.

Mr. Neal, after having acquired all of the property, as we know, conveyed an undivided one-third, first, to Goodwill, in 1887. Goodwill, Crichton, and Neal dealt with each other in lands, and apparently were personally friendly and assessed the property together, etc. In the year 1894, the first Mrs. Neal died, leaving as her sole and only child and heir-at-law Mrs. Emma Neal, married to one Douglas. Apparently some discord had arisen between the daughter and her father, because on July 14, 1897, Mr. Neal instituted a suit in partition against his daughter, naming the husband also, Mr. E. L. Douglas, to liquidate the previous community of acquets and gains. Personal citation was had upon the daughter and the judgment was granted on October 6, 1897. Ensuingly, 2452.83 acres and 296.96 acres offered for sale by the Sheriff of Webster Parish was purchased by Mr. Neal on November 27, 1897. On January 25, 1900, a formal deed was executed by the sheriff, and this document was recorded on July 7, 1900, in Volume 10, page 228. Then on October 17, 1900, the deed with which we are familiar, by Mr. Neal to Thomas Crichton, Sr., was recorded, being "my one-third and undivided interest" in and to the same 2452.83 acres and 296.96 acres. ·

Counsel for the Crichtons has stressed the point that the words of Mr. T. B. Neal to Mr. Crichton, Sr., to-wit: "my one-third and undivided interest", mean, when used by Mr. T. B. Neal, this: "My one-third" for the half-share that he owned as a member of the marriage community, one-third of the whole, and the "undivided interest" referring to his wife's share, one-third of the whole, which he, Mr. Neal, bought from the sheriff's sale

and for which there is a deed of record. Neal deeded, therefore, the two-thirds of the whole property to Mr. Crichton, leaving himself none. The Goodwills had the other third by previous sale, as aforestated.

It is true that when Mr. Neal sold to Mr. Crichton, Sr., he was then the owner unqualifiedly of all the property, free of any interest in his daughter, whom he had settled in the partition, by other adjustments, as the inventory discloses, but in the face of what we have already stated in this opinion, that if you divide the total acreage of the Neal-Crichton deed by three, then multiply that by $1.12½ per acre, you get practically the total that Mr. Neal gives as the consideration in the deed; so, we are unable to follow this style of reasoning. With the total consideration and the actual number of acres and the price per acre given, it is conclusive that the quoted language of Mr. Neal at the beginning is the equivalent of saying "an undivided one-third interest."

We have said that the Crichtons owned one third; does Mr. Saucier own the other third and, consequently, get the other half of the money on deposit?

Saucier has two deeds to himself. One is dated in 1923, from Mrs. Ida F. Neal, the wife of T. B. Neal. We have cast some reflection already in this opinion upon this deed; but, of record in Webster Parish, this deed stood unopposed from 1923 to 1942, when the deed of 1903 from Mrs. Ida F. Neal to Mrs. Emma Neal Douglas was recorded. Under McDuffie v. Walker, 125 La. 152, 51 So. 100, and the numerous approving cases since, even though Saucier was aware of the deed in Fulton County, Georgia, wherein Mrs. Ida F. Neal, in 1903, had sold to Mrs. Emma Neal Douglas all she later sold, in 1923, to Saucier—to the world, from the Webster Parish · records, the situs of the property, Saucier had title.

Assuming that this deed conveyed nothing to Mr. Saucier, when he buys in 1942 (this is his second deed) from the Wachovia Bank & Trust Company, trustee, the inheritance of Clarence Ashcraft Chandler, a minor, we believe he acquires the property at issue.

The only cloud showing against this conclusion is the one caused by the question of whether or not Clarence Amasa Chandler, Jr., who is a special legatee under the will of Clarence A. Chandler, his

father, has any right to the money on deposit. The receipt by him in the record shows that his special legacy was fully paid and that he acknowledges receipt "in full settlement of all claims and demands to date against the estate of the said Clarence A. Chandler, deceased." We are satisfied that Clarence Amasa Chandler is a stranger to our issue, and that Clarence Ashcraft Chandler is the sole testamentary recipient, and that Saucier has bought from him the property to be received and so is entitled to the half of the money on deposit.

Judgment will be signed to cover the whole opinion.

Harriet McKinley Brown, of Milwaukee, Wis., pro se.

Kelly & Le Vander, of South St. Paul, Minn., for defendant National Surety Corporation.